**J.G., a minor, by and through his Guardian Ad Litem, Nancy JIMENEZ, Plaintiff,**

v.

**BALDWIN PARK UNIFIED SCHOOL DISTRICT, et al., Defendants.**

**Case No. CV 13–5690 FMO (JEMx).**

United States District Court, C.D. California.

Signed March 20, 2015.

David M. Grey, Grey and Grey, Santa Monica, CA, for Plaintiff.

Meredith Brittain Reynolds, Law Offices of Jeff C. Marderosian, Pasadena, CA, for Defendants.

## ORDER REVERSING DECISION OF OFFICE OF ADMINISTRATIVE HEARINGS

FERNANDO M. OLGUIN, District Judge.

### *INTRODUCTION*

This appeal concerns an Administrative Due Process Hearing under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* Plaintiff J.G. ("plaintiff" or "J.G."), by and through his Guardian Ad Litem, Nancy Jimenez ("Ms. Jimenez"), brought this action seeking to reverse a decision of the California Office of Administrative Hearings ("OAH"). (*See* Complaint; Order Granting Application for Appointment of Guardian Ad Litem for the Minor, J.G.). The decision found that defendants Baldwin Park Unified School District ("BPUSD") and Covina Valley United School District ("CVUSD") (collectively "the Districts") provided plaintiff a free and appropriate public education ("FAPE") in the least restrictive environment ("LRE") pursuant to the IDEA. (*See* Administrative Record ("AR") at 748–75).[1] Plaintiff also seeks other relief, including a referral to the California School for the Deaf in Riverside ("CSDR"), reimbursement, damages, and attorney's fees and

---

1. The court uses AR page numbers as they are printed on the documents themselves. There was an inadvertent mislabeling of the AR from pages 808 *et seq.,* as there is no page numbered 807.

costs. (*See* Complaint at Prayer for Relief).

The court, having reviewed all the briefing with respect to the parties' Cross–Motions for Summary Judgment and the Administrative Record, concludes that oral argument is not necessary to resolve the parties' Cross–Motions. *See* Fed.R.Civ.P. 78; Local Rule 7–15; *Willis v. Pac. Mar. Ass'n*, 244 F.3d 675, 684 n. 2 (9th Cir.2001).

## SUMMARY OF FACTS

The crux of this case is J.G.'s request for a referral to CSDR. Therefore, a brief description of the program is necessary to provide context for the court's discussion below. CSDR is a school for the deaf operated under the California Department of Education. (*See* AR at 1639). The school's day program is free, but the student's local educational agency[2] is responsible for the cost of transportation or for the $7,000 annual fee for room and board for residential students. (*See id.* at 1657). CSDR serves approximately 420 students. (*See id.* at 1640). American Sign Language ("ASL") is the primary mode of communication at CSDR for instruction and education. (*See id.* at 1647). CSDR also provides speech services for students with cochlear implants. (*See id.*). CSDR also provides extracurricular activities such as school sports programs. (*See id.* at 1648–49).

To be admitted to CSDR, a student must have a referral from his or her local educational agency. (*See* AR at 1642). After it receives the referral and a completed application form, CSDR requests various documents regarding the student's education and abilities, including the current Individual Education Plan ("IEP"), recent assessments, an audiogram, and other relevant school records. (*See id.*).

CSDR then conducts an assessment of the student to determine suitability for placement. (*See id.* at 1643). This can include the student attending classes at CSDR for 60 days, as well as other formal assessments that the CSDR team deems appropriate. (*See id.*).

A referral does not mean that a student will be enrolled in CSDR. (*See* AR at 1642–43). Instead, at the conclusion of the assessment process, an IEP meeting is convened to discuss suitability of placement at CSDR, and CSDR staff attends the meeting. (*See id.* at 1646). Together, the group makes the ultimate decision regarding the student's placement. (*See id.* at 1647). However, the local educational agency still has a responsibility to offer a FAPE, and CSDR cannot place a student at its school without the approval of the local educational agency. (*See id.* at 1657).

## I. J.G.'S BACKGROUND, DIAGNOSIS, AND ELEMENTARY SCHOOL EDUCATION.

J.G. was diagnosed as profoundly deaf when he was approximately 18 months old. (*See* AR at 750). During the relevant time period, he lived within the boundaries of BPUSD. (*See id.*). He received hearing aids at the age of two and auditory intervention services at the Pasadena Hear Center for approximately two years. (*See id.*). When he was almost four years old, BPUSD assessed J.G. and determined that he was eligible for special education as hearing impaired with a language/speech disorder. (*See id.*). J.G.'s primary mode of communication is ASL. (*See id.*).

BPUSD has educated J.G. through CVUSD continuously since he was approximately four years old. (*See* AR at 657). Pursuant to his initial IEP, J.G. was placed in the Total Communication Pro-

---

**2.** California defines "local educational agency" as a "school district, a county office of education, a nonprofit charter school partici-

pating as a member of a special education local plan area, or a special education local plan area." Cal. Educ.Code § 56026.3.

gram ("TCP") at CVUSD's Vincent Children's Center. (*See id.* at 750). The TCP supports deaf and hard-of-hearing ("DHH") students by providing instruction in a variety of modes of communication, including ASL, cued speech, verbalization, and lip reading. (*See id.* at 751). It is designed to help DHH students learn the skills necessary to communicate with persons who can hear. (*See id.*).

When J.G. was approximately six years old, he was enrolled in the TCP at CVUSD's Mesa Elementary School ("Mesa"). (*See* AR at 750). At Mesa, J.G. participated in an educational program with hearing peers using ASL and an interpreter. (*See id.* at 750–51). BPUSD then placed J.G. in the TCP at CVUSD's Sierra Vista Middle School ("Sierra Vista"). (*See id.* at 619).

Language acquisition presents significant challenges for deaf students. (*See* AR at 123739). J.G. must use ASL, his primary language, to learn English, his second language. (*See id.* at 1113–14, 1860–61). J.G. received a cochlear implant when he was ten years old to assist him with language acquisition. (*See id.* at 1178). Effective use of the cochlear implant requires developed communication skills in ASL. (*See id.* at 1130–32). Because J.G. still needs to develop ASL as his primary language, he is not able to use his cochlear implant effectively. (*See id.* at 1113–15 & 1131–32). As a result, J.G. is not able to understand speech, auditorily alone, at any level. (*See id.* at 1495). He functions at the level of a person under two years of age in understanding spoken vocabulary. (*See id.* at 1172).

## II. INDIVIDUAL EDUCATION PROGRAM MEETINGS AND ASSESSMENTS.

### A. *May 12, 2011 IEP.*

J.G.'s annual IEP meeting took place on May 12, 2011, at Sierra Vista. (*See* AR at 619). Those in attendance included J.G.'s parents, CVUSD educational specialist Heidi Headcock ("Ms. Headcock"), J.G.'s special education teacher, Paul Halpert ("Mr. Halpert"), speech pathologist Cheryl Weinberg ("Ms. Weinberg"), speech and language pathologist Sylvia Kaparos ("Ms. Kaparos"), and J.G.'s P.E. teacher. (*See id.* at 648–50). A representative from BPUSD did not attend. (*See id.* at 649).

At the meeting, J.G.'s mother, Nancy Jimenez ("Ms. Jimenez"), stated that basic books are easy for J.G., but when reading becomes difficult, he gets frustrated and wants to stop. (*See* AR at 619). She expressed her hope that he would be able to read closer to grade level. (*See id.*). The IEP team discussed goals and objectives related to reading comprehension, vocabulary/concept development, written/oral language conventions, mathematics, prevocational education, articulation, writing strategies, auditory comprehension/auditory memory, and other topics. (*See id.* at 622–38). The team discussed J.G.'s progress in each of these areas and agreed that J.G. would receive testing accommodations, (*see id.* at 640), have an extended school year, (*see id.* at 642), receive grades according to differential grading standards, (*see id.* at 645), and receive interpreting services. (*See id.*). Thus, BPUSD's offer of a FAPE included specialized academic instruction for 275 minutes daily in a DHH classroom, language and speech services for 75 minutes weekly, audiological services for 45 minutes annually, aural rehabilitation for 60 minutes weekly, curb to curb transportation, and an extended school year. (*See id.* at 649). With these services, J.G. would spend approximately 69% of his time in a special education environment, and 31% of his time in a general education environment. (*See id.* at 642).

J.G.'s mother expressed concerns about J.G.'s progress and asked about "exploring the option" of sending J.G. to CSDR. (*See* AR at 649). The CVUSD representatives and teachers stated that a discussion regarding CSDR would have to be held at a later date when a representative from BPUSD "who is authorized to make a decision regarding that placement" would be able to attend. (*See id.*). Subsequently, J.G.'s mother signed the IEP and consented to its implementation. (*See id.* at 650).

### B. *July 15, 2011, Addendum Meeting.*

Certain members of J.G.'s IEP team held an addendum meeting to discuss J.G.'s placement at CSDR on July 15, 2011. (*See* AR at 651, 653). J.G.'s mother and grandmother, BPUSD Director of Student Achievement Madalena Arellano ("Ms. Arellano"), CVUSD administrator Abigail Cabrera ("Ms. Cabrera"), Ms. Headcock, and Ms. Weinberg attended. (*See id.* at 651–52).

J.G.'s mother stated that she was concerned about her son's reading, writing, and ASL ability, and that J.G. might benefit from CSDR's program. (*See* AR at 653). Ms. Headcock responded, stating that she could implement strategies at Sierra Vista such as "focusing on story-telling in sign language, using small cooperative groups that focus on students with similar communication mode ... and building sign language vocabulary." (*See id.*). Ms. Jimenez again expressed her concern that J.G. would be " 'illiterate' when he finishes high school." *(See id.)*. At the conclusion of the meeting, Ms. Arellano said she would review J.G.'s needs and progress in further detail, and perhaps visit CSDR, before making a decision regarding placement. (*See id.*). The IEP was not amended. (*See id.* at 651–54).

### C. *August 4, 2011, Addendum Meeting.*

J.G.'s mother and Ms. Arellano met again on August 4, 2011, to discuss a possible CSDR referral. (*See* AR at 555–56). Prior to the meeting, Ms. Arellano informed J.G.'s mother that Ms. Headcock would not attend, and Ms. Jimenez was asked to formally excuse Ms. Headcock, Ms. Cabrera, and Ms. Weinberg. (*See id.* at 553, 559). BPUSD general education teacher, Kathy Warden ("Ms. Warden"), attended. (*See id.* at 553, 555). J.G.'s mother again expressed her desire that J.G. receive "more intense signing and services." (*Sée id.* at 556). Ms. Arellano reported that she had called CSDR and discussed the program, and she had been told that CSDR only accepts Los Angeles County students who dorm there. (*See id.*). Ms. Jimenez then asked Ms. Arellano to determine whether J.G. could attend if he lived on campus, but Ms. Arellano stated again that BPUSD was only offering the DHH program at CVUSD as a FAPE. (*See id.* at 557). Ms. Jimenez disagreed with the offer, and stated she intended to write a letter of appeal. (*See id.*). Again, the IEP was not modified. (*See id.*). Accordingly, J.G. spent the 2011–2012 school year as a seventh grader in the TCP at Sierra Vista.[3]

### D. *May 2012 Triennial Assessments.*

CVUSD conducted J.G.'s triennial assessments in May 2012. (*See* AR at 657–87). CVUSD School Psychologist Larissa Isayo ("Ms. Isayo") conducted J.G.'s Psycho–Educational Study, which involved reviewing J.G.'s school records, observing him in the classroom, obtaining reports from his teachers and parents, and administering various tests. (*See id.* at 658). She found that although J.G. performed better at tasks involving rote memory,

---

**3.** After the 2011 IEP and addendum meetings, J.G. filed his initial Complaint for Due Process and Request for Mediation with OAH. (*See infra* at "Proceedings").

"[h]e struggled very much with immediate recall of any details of a[sic] 2 short stories read to him separately (and interpreted in ASL)." (*Id.* at 661). J.G. also "appeared to have a lot of difficulty understanding and following the directions[,]" and it was difficult for Ms. Isayo "to assess whether it was due to memory difficulties, language problems, or both." (*Id.* at 662).

Ms. Isayo's report also referenced various findings and reports provided by Ms. Weinberg, Ms. Kaparos, Ms. Headcock, general education teachers Jody McCreery ("Ms. McCreery") and Matt Froid ("Mr. Froid"), CVUSD school nurse Mayda De-Castro ("Ms. DeCastro"), and CVUSD audiologist Blaze Kistler ("Mr. Kistler"). (*See* AR at 657–72). Ms. Isayo referenced Ms. Weinberg's finding that since J.G.'s 2009 assessment, J.G. showed "growth and improvement in his articulation skills[,]" which are now "in the upper end of the 4–7 year old range[.]"[4] (*Id.* at 662). His expressive language was also "at the upper end of the 4–7 year old range[.]" (*Id.*).

In the area of aural rehabilitation, Ms. Isayo referenced Ms. Kaparos's findings that J.G. "demonstrates a severely limited understanding of spoken vocabulary." (AR at 663). J.G. had made "limited progress in his listening skills[,] and Ms. Kaparos emphasized that "[ASL] should continue to be his primary mode of communication.'" (*Id.*). She recommended that the IEP team consider discontinuing aural rehabilitation therapy, since "it [did] not appear that [J.G. was] making functional gains in his listening skills[.]" (*Id.*).

Ms. Isayo also included portions of Ms. Headcock's report regarding J.G.'s academic skills, which noted that J.G. "struggles in the area of vocabulary and comprehension." (AR at 663). Ms. Headcock's assessment results indicated that J.G.

"was able to read most words fluently at the first grade level, but not at the second grade level." (*Id.* at 664). J.G. also "struggles to produce complete sentences that support his main idea" and overall has reading and writing skills "within the Far Below Average range[.]" (*Id.*). Ms. Headcock noted, however, that J.G.'s computation skills are "strong in basic addition/subtraction and multiplication/division." (*Id.*). Finally, J.G.'s teachers and parents shared with Ms. Isayo that J.G. is "respectful, cooperative, and pleasant[,] and that he "gets along very well with peers and adults" (AR665).

E. *May 11, 2012, IEP.*

The Districts held J.G.'s next IEP meeting on May 11, 2012. (*See* AR at 688–711). Ms. Jimenez, CVUSD Special Education Administrator Alma Guerrero ("Ms. Guerrero"), Ms. McCreery, Mr. Halpert, Ms. Isayo, BPUSD school psychologist Rebecca Parres ("Ms. Parres"), Ms. Weinberg, Ms. Kaparos, CVUSD Support Services Specialist for DHH students Patricia Shawn ("Ms. Shawn"), an ASL interpreter, Mr. Kistler, and Ms. Headcock attended the meeting. (*See id.* at 709).

Again, Ms. Jimenez noted that while J.G. enjoys math and science and is social, she was concerned about his ASL and his English reading and writing. (*See* AR at 688, 707). Like in the May 12, 2011, IEP meeting, the team addressed J.G.'s progress with respect to the following goals: reading comprehension, vocabulary/concept development, written/oral language conventions, mathematics, prevocational, articulation, social studies/science vocabulary, and auditory comprehension/auditory memory. (*See id.* at 691–98). The teachers and administrators agreed that J.G. could participate in testing with accommo-

---

**4.** In May 2012, J.G. was 13 years and seven months old and in the seventh grade. (*See* AR at 662).

dations, (*see id.* at 699), have an extended school year (*see id.* at 708), receive grades according to differential standards (*see id.* at 704), and receive interpreting services. (*See id.*). BPUSD's offer of a FAPE included specialized academic instruction for 220 minutes daily, speech and language services for 75 minutes weekly, audiology services for 45 minutes yearly, interpreter services for 165 minutes daily, aural rehabilitation for 60 minutes weekly, curb-to-curb transportation, and an extended school year. (*See id.* at 708).

During the meeting, Ms. Jimenez again asked about a referral to CSDR. (*See* AR at 707). Ms. Guerrero stated that the team could not discuss J.G.'s placement "because of the due process/mediation that is currently ongoing." (*Id.*). Ms. Jimenez provided her provisional consent to the IEP, writing that she "continue[s] to disagree with the IEP, but [is] consenting to having it implemented on a temporary and provisional basis while due process is pending." (*Id.* at 711). She also noted that she no longer agreed with, and therefore withdrew, the statement that said she "participated as a member of this IEP team." (*See id.*). Pursuant to his IEP, J.G. attended Sierra Vista as an eighth grader during the 2012–2013 school year.[5] (*See id.* at 688).

### F. *Additional Evidence.*

J.G. and BPUSD submitted additional evidence for the court's consideration. J.G. submitted a declaration in which he "explain[s] why [he] want[s] to go to the school for the deaf in Riverside and how difficult it is to communicate with [his] classmates at school, most of whom do not know [ASL]." (*See* Declaration of J.G. ("J.G. Decl." or "Supplemental Declaration") at ¶ 1). He states that there are many times during the school day when he is not able to communicate with others, because there is no ASL interpreter available. (*See id.* at ¶ 2). "This happens walking down the hallways during passing, during lunch and on the school bus going to and from school." (*See id.*). He also states that his ASL interpreter is an adult, and there are times when he is "too embarrassed to use the interpreter to translate what [he] want[s] to say to a classmate." (*See id.* at ¶ 3).

In a letter translated by Ms. Jimenez, J.G. added: "I really don't know what is happening [sic] during lunch time, sometimes the students have special events like games and wear a silly hat day to school or have a silly hair day at school and I don't know what is occurring [sic] because I don't understand what the banners or posters that were placed say." (J.G. Decl. Exhibit ("Exh.") 1 at 1). He does not always ask questions because he does not "want other students laughing" or "calling [him] dumb." (*Id.*). Finally, he explained, "I want to be more independent and learn to communicate with the hearing people by writing or texting but I can't do that now because I can't really read now." (*See id.*).

BPUSD submitted the declarations of J.G.'s ASL interpreters at his school, Julie Starrett and Erica Del Real. (*See* Declaration of Julie Starrett in Rebuttal of J.G. Declaration Dated February 1, 2014," ("Starrett Decl."); Declaration of Erica Del Real in Rebuttal of J.G. Declaration Dated February 1, 2014 ("Del Real Decl.")). The interpreters' declarations describe J.G.'s participation in school activities, such as wrestling and basketball, and state that he is well-liked by his teammates and enjoys interacting with them. (*See* Starrett Decl. at ¶¶ 15 & 18; Del Real Decl. at ¶¶ 13 & 17–18). Both also note that J.G. has never told them that he is lonely at school, nor has he ever expressed

---

**5.** After this IEP meeting, the Districts filed a Due Process Complaint, and J.G. subsequent- ly amended his Complaint. (*See infra* at "Proceedings").

to them a desire that he wants to go to CSDR. (*See* Starrett Decl. at ¶¶ 27–32; Del Real Decl. at ¶¶ 20–22).

## *PROCEEDINGS*

On March 27, 2012, J.G., by and through Ms. Jimenez, filed a Complaint for Due Process and Request for Mediation ("Due Process Complaint") with OAH, challenging the Districts' failure to refer him to CSDR. (*See* AR at 1–5). J.G. filed a First Amended Complaint on April 16, 2012, and a Second Amended Complaint on April 27, 2012. (*See id.* at 220). Mediation was initially set for May 1, 2012. (*See id.* at 14). The parties agreed to continue mediation to June 19, 2012. (*See id.* at 140).

During the pendency of the OAH proceedings, J.G.'s next annual IEP meeting was held in May 2012. (*See* AR at 688). After that meeting, the Districts filed a Due Process Complaint against J.G. to affirm that the 2012 IEP complied with the IDEA. (*See id.* at 151–58). In July 2012, the OAH issued an order consolidating the cases. (*See id.* at 220). On September 28, 2012, J.G. filed a Third Amended Due Process Complaint. (*See id.*). This complaint added allegations to challenge the May 11, 2012, IEP. (*See id.* at 181–87). The case went to hearing in March 2013. (*See id.* at 748).

On May 13, 2013, OAH Administrative Law Judge ("ALJ") Krikorian issued a decision regarding the complaints that had been filed by J.G. and the Districts ("ALJ's Decision"). (*See* AR at 748–74). The ALJ's Decision addressed the following issues: (1) whether the Districts denied J.G. a FAPE in his May 12, 2011, IEP because: (a) they failed to consider the related services and program options available to J.G.—in particular, those at CSDR—in his primary mode of communication, ASL; and (b) they failed to offer an appropriate placement for J.G.; (2) wheth-

er the Districts denied J.G. a FAPE in his May 11, 2012, IEP for the same reasons alleged with respect to the May 12, 2011, IEP; and (3) whether the Districts procedurally complied with the IDEA and offered J.G. a FAPE in his May 11, 2012, IEP, such that they may implement the IEP without parental consent. (*See id.* at 749–50, 761). The ALJ found against J.G. on all issues. (*See id.* at 774).

On August 15, 2013, plaintiff, seeking to reverse the ALJ's Decision, filed a Complaint Appealing Decision of the California Office of Administrative Hearing ("Complaint") in this court. In the Complaint, plaintiff named as defendants BPUSD and CVUSD. Plaintiff's first cause of action seeks reversal of the ALJ's Decision, because it was not supported by the evidence and because the ALJ failed to conduct the hearing and make evidentiary rulings in the manner required by law. (*See* Complaint at ¶¶ 15–16). Plaintiff's second cause of action alleges that the Districts violated the IDEA and the provisions of the California Education Code enacted to implement and supplement the IDEA. (*See id.* at ¶¶ 18–20). Plaintiff seeks an order: (1) reversing the ALJ's Decision; (2) directing BPUSD to refer him to the CSDR; (3) granting him compensatory education and reimbursements; (4) granting him general and special damages according to proof; (5) granting him attorney's fees and costs; and (6) granting him such other relief as the court deems just and proper. (*See id.* at Prayer for Relief).

On October 10, 2013, BPUSD filed its Answer, in which it admitted that plaintiff is disabled within the meaning of IDEA, but denied that it failed to provide a FAPE to plaintiff. (*See* Answer of Baldwin Park Unified School District to Complaint ("Answer") at 1–3).[6] It also raised two affirmative defenses: first, that the ALJ afforded the parties all rights provid-

---

**6.** On November 21, 2013, plaintiff filed a no- tice of dismissal, which voluntarily dismissed

ed under applicable law; and second, that this court lacks jurisdiction to rule on plaintiff's second cause of action. (*See id.* at 3–4). BPUSD requests that the ALJ's Decision be upheld and that the second cause of action be dismissed for lack of jurisdiction. (*See id.* at 4).

On June 11, 2014, J.G. and BPUSD filed their Cross–Motions for Summary Judgment. (*See* Joint Notice of Cross–Motions for Summary Judgment and accompanying Joint Brief). Thereafter, each party submitted a supplemental memorandum in support of its motion.

### *LEGAL STANDARD*

■ The IDEA provides that "[a]ny party aggrieved by the findings and decision" reached through the state administrative hearing process "shall have the right to bring a civil action with respect to the complaint ... in a district court of the United States." 20 U.S.C. § 1415(i)(2). In such actions, the court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." *Id.* The burden of persuasion is on the party challenging the administrative decision. *L.M. ex rel. Sam M. v. Capistrano Unified Sch. Dist.*, 538 F.3d 1261, 1269 (9th Cir.2008).

■ Judicial review in IDEA cases "differs substantially from judicial review of other agency actions, in which courts generally are confined to the administrative record and are held to a highly deferential standard of review." *Ojai Unified*

*Sch. Dist. v. Jackson,* 4 F.3d 1467, 1471 (9th Cir.1993), *cert. denied,* 513 U.S. 825, 115 S.Ct. 90, 130 L.Ed.2d 41 (1994). In IDEA cases, courts give "less deference than is conventional" in the review of administrative decisions. *Id.* at 1472. As summarized in *Ash v. Lake Oswego Sch. Dist.,* 980 F.2d 585 (9th Cir.1992):

> The court, in recognition of the expertise of the administrative agency, must consider the findings carefully.... After such consideration, the court is free to accept or reject the findings in part or in whole. Thus, ... federal courts cannot ignore the administrative findings.... Ultimately, however, the weight to be accorded administrative findings under the IDEA is a matter within the discretion of the federal courts.

*Id.* at 587–88 (internal citations omitted); *see Ojai,* 4 F.3d at 1474.

■ "The amount of deference accorded the hearing officer's findings increases where they are 'thorough and careful.'" *Capistrano Unified Sch. Dist. v. Wartenberg,* 59 F.3d 884, 891 (9th Cir. 1995); *see Anchorage Sch. Dist. v. M.P.,* 689 F.3d 1047, 1053 (9th Cir.2012) ("An administrative hearing officer's 'thorough and careful' findings receive particular deference."). After such consideration, "the court is free to accept or reject the findings in part or in whole." *Gregory K. v. Longview Sch. Dist.,* 811 F.2d 1307, 1311 (9th Cir.1987) (citation omitted). "When the court has before it all the evidence regarding the disputed issues, it may make a final judgment in what is not a true summary judgment procedure [but] a bench trial based on a stipulated record." [7]

---

CVUSD without prejudice. (*See* Notice of Dismissal Pursuant to Federal Rules of Civil Procedure 41(a) or (c)).

7. In its papers, BPUSD repeatedly argues that various facts asserted by J.G. without citations to the record must be deemed admissions by J.G. that he lacks evidence of those

facts. (*See, e.g.,* Joint Brief at 20, 24 & 41; BPUSD Supplemental Memorandum in Support of Motion for Summary Judgment ("BPUSD Supp. Mem.") at 5–6 & 9). As stated above, however, summary judgment procedures in IDEA cases are unusual. In evaluating compliance with the IDEA's proce-

*Miller v. San Mateo–Foster City Unified Sch. Dist.*, 318 F.Supp.2d 851, 859 (N.D.Cal.2004) (internal quotation marks omitted); *see Ojai*, 4 F.3d at 1472 (finding such a procedure proper when the court "had before it all of the[ ] evidence regarding the issues in. dispute[.]"); *see also, Beth B. v. Van Clay*, 282 F.3d 493, 496 n. 2 (7th Cir.), *cert. denied*, 537 U.S. 948, 123 S.Ct. 412, 154 L.Ed.2d 292 (2002) (noting that summary judgment is appropriate in IDEA cases "even when the facts are in dispute, and is based on a preponderance of the evidence."); *O'Toole v. Olathe Dist. Schs. Unified Sch. Dist. No. 233*, 144 F.3d 692, 709 (10th Cir.1998) (acknowledging that in IDEA cases, even at summary judgment, the district court has "an obligation to independently review the record and reach a decision based on a preponderance of the evidence.").

## DISCUSSION

### I. INDIVIDUALS WITH DISABILITIES EDUCATION ACT.

 In enacting the IDEA, Congress sought to "ensure that all children with disabilities have available to them a free and appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living;" "to ensure that the rights of children with disabilities and parents of such children are protected; and" "to assist States, localities, educational service agencies, and Federal agencies to provide for the education of all children with disabilities[.]" 20 U.S.C. § 1400(d)(1)(A)-(C). "To accomplish these objectives, the federal government provides funding to participating state and local educational agencies, which is contingent on the agency's compliance with the IDEA's procedural and substantive requirements." *Anchorage Sch. Dist.*, 689 F.3d at 1053–54; *Ojai*, 4 F.3d at 1469 ("The IDEA provides federal funds to assist state and local agencies in educating children with disabilities, but conditions such funding on compliance with certain goals and procedures.").

The IDEA's primary goal of assuring that all disabled children have a "free and appropriate public education," or FAPE, that meets their unique educational needs, *see* 20 U.S.C. § 1400(c), is achieved through the development of an IEP for each child with a disability. *See* 20 U.S.C. § 1414; *Ojai*, 4 F.3d at 1469. The IEP is crafted by a team that includes a student's parents, teachers, the local educational agency, and where appropriate, the student. *See* 20 U.S.C. § 1414(d)(1)(B). The

dures and the educational benefits provided to each student, the court is empowered to conduct an independent review of the record and consider any additional evidence. *See Board of Educ. of Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 205–07, 102 S.Ct. 3034, 3050–51, 73 L.Ed.2d 690 (1982). Although local rules and standard orders regarding summary judgment may assist the court in reviewing particular issues, it is not required in IDEA cases. *See T.Y. v. N.Y. City Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir.2009), *cert. denied*, 560 U.S. 904, 130 S.Ct. 3277, 176 L.Ed.2d 1183 (2010) (finding that courts should be "concerned more with a just outcome for a disabled student than with judicial. efficiency," and that adherence to lo-

cal rules regarding summary judgment should not be dispositive).

The court reaches the same conclusion with respect to BPUSD's assertion (*see* BPUSD Supp. Mem. at 2) that J.G. failed to brief, and therefore waived, issues related to procedural violations by the ALJ. According to the IDEA and Supreme Court decisions, district courts must consider the record as a whole. *See, e.g., See Rowley*, 458 U.S. at 206–07, 102 S.Ct. at 3051; *see also Ojai*, 4 F.3d at 1471–72 (noting that the court "shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and [make a] decision on the preponderance of the evidence[.]") (quoting 20 U.S.C. § 1415(e)(2)).

IEP must consist of various items including "a statement of the child's present levels of academic achievement and functional performance," "a statement of measurable annual goals, including academic and functional goals," and "a description of how the child's progress toward meeting the annual goals ... will be measured." *Id.* at § 1414(d)(1)(A). Local educational agencies must review, and where appropriate revise, each student's IEP at least annually. *See id.* at 1414(d)(4)(A).

The IDEA also puts in place extensive procedural safeguards for the benefit of disabled children and their parents, including the opportunity to review records, the right to be notified of any changes in identification, evaluation, and placement of the student, as well as the right to file a Due Process Complaint regarding their child's education. 20 U.S.C. § 1415(b)-(h). Such complaints may lead to mediation or an appearance at an impartial Due Process Hearing conducted by a hearing officer. *See id.* at § 1415(e)-(f).

■ State statutes, and regulations enacted pursuant to those statutes, also apply in IDEA cases, *see Board of Educ. of the Hendrick Hudson Central Sch. Dist., Westchester County v. Rowley,* 458 U.S. 176, 203, 102 S.Ct. 3034, 3049, 73 L.Ed.2d 690 (1982) (a FAPE "must be provided at public expense, *must meet the State's educational standards,* ... and must comport with the child's IEP" (emphasis added)), provided that the state provisions are not inconsistent with federal standards. *See Union Sch. Dist. v. Smith,* 15 F.3d 1519, 1524 (9th Cir.), *cert. denied,* 513 U.S. 965, 115 S.Ct. 428, 130 L.Ed.2d 341 (1994). The California Education Code ("Education Code") sets forth requirements for the education of students with exceptional needs, including deaf students, *see* Cal.

Educ.Code § 56000 *et seq.,* and includes specific findings and declarations with respect to their education. *See id.* at § 56000.5(b). Further, the Education Code goes into significant detail regarding what must be discussed at an IEP meeting for a deaf student. *See id.* at § 56345. With respect to referrals to the California Schools for the Deaf, the Education Code states that "[a] pupil may be referred, as appropriate, for further assessment and recommendations to the California Schools for the Deaf[.]" [8] *Id.* at § 56326.

■ The court finds no authority suggesting that the Education Code provisions relating to deaf students place a higher burden on the District than the requirements for a FAPE under the IDEA. *See Redding Elementary Sch. Dist. v. Goyne,* 2001 WL 34098658, *6 (E.D.Cal. March 6, 2001). Even if that were the case, the Ninth Circuit has held that even state standards that "impose a greater duty to educate handicapped children, if they are not inconsistent with federal standards, are enforceable in federal court under IDEA." *Union Sch. Dist.,* 15 F.3d at 1524. In short, the court considers the Education Code's provisions regarding deaf students as part of the local educational agency's mandatory obligation under the IDEA to formulate an IEP that is tailored to the individual needs of the disabled student. *See* 20 U.S.C. § 1401(29).

## II. DEFERENCE TO ALJ DECISION.

■ As noted above, "[t]he amount of deference accorded the hearing officer's findings increases where they are 'thorough and careful.'" *Capistrano Unified Sch. Dist.,* 59 F.3d at 891; *Miller,* 318 F.Supp.2d at 859. As explained below, the ALJ's decision ignores and mischaracterizes key evidence. As a result, the court

---

**8.** The criteria local educational agencies should consider in evaluating whether placements may be appropriate are enumerated in the California Code of Regulations. *See* 5 C.C.R. § 17662.

will give substantially less deference to the ALJ's Decision. *See Gregory K.*, 811 F.2d at 1311 (after considering ALJ's findings, "the court is free to accept or reject the findings in part or in whole.").

### A. *Failure to Consider Witness Testimony.*

#### 1. Testimony of Ms. Jimenez

█ "[B]ecause [parents] observe their children in a multitude of different situations, they have a unique perspective of their child's special needs." *Amanda J. ex rel. Annette J. v. Clark County Sch. Dist.*, 267 F.3d 877, 891 (9th Cir.2001). Here, rather than consider Ms. Jimenez's unique perspective, the ALJ improperly discounted her testimony. In fact, the ALJ discussed, and summarily dismissed, only one small portion of Ms. Jimenez's testimony, stating that "her testimony that she wanted to 'try something different' was not enough to credibly challenge the Districts' witnesses' opinions" regarding J.G.'s progress. (*See* AR at 768).

Rather than analyzing and considering Ms. Jimenez's testimony, much of the ALJ's discussion of Ms. Jimenez is related to the largely irrelevant topic of her ASL skills. (*See, e.g.,* AR at 751–52, 754, 761, 769). The record provides ample evidence of J.G.'s failure to make sustained ASL progress and his mother's desire that J.G.'s ASL skills improve. (*See, e.g., id.* at 619, 653, 688). Rather than address the Districts' responsibility with respect to J.G.'s ASL skills under the IDEA, the ALJ repeatedly referred to witness testimony that blamed J.G.'s parents for their "very basic" ASL, which provided only "limited opportunities" for J.G. to practice

at home. (*See id.* at 752, 761). This case is about J.G.'s FAPE and whether his IEP properly addresses his educational needs, especially as they relate to his language and communication skills. Focusing on the language skills of J.G.'s mother is wholly inappropriate and irrelevant to the issue of whether BPUSD has complied with its obligations under the IDEA. *See Anchorage Sch. Dist.*, 689 F.3d at 1055 ("We agree that the district court improperly shifted the burden for substantive compliance with the IDEA from the [school district] to [the student's] parents.").

Further, even assuming Ms. Jimenez's ASL language ability was somehow relevant to the ALJ's IDEA analysis, the ALJ's Decision fails to give an accurate description of Ms. Jimenez's testimony. If the ALJ had thoroughly and fairly evaluated Ms. Jimenez's testimony, the ALJ would have noted Ms. Jimenez's statements regarding her family's use of ASL. (*See* AR at 1772 & 1780–83) (describing the weekly classes she and her husband, mother, and sister have taken at Mesa, both beginning and intermediate, in Spanish and in English; the semester of ASL she took at Mt. San Antonio College; the software she purchased to study at home; and the ASL catechism class that she, J.G., and J.G.'s sister took). Ms. Jimenez also testified that the family uses ASL and English, and when she communicates with J.G., she signs and speaks at the same time. (*See id.* at 1780). If the family's ASL use (or lack thereof) was sufficiently important to warrant multiple references throughout the ALJ's Decision, then the ALJ should have taken Ms. Jimenez's entire testimony on the subject into account.[9]

9. This issue also raises concerns with respect to the logic of the ALJ's Decision: if J.G.'s delayed development in ASL, (*see* AR at 752), is due in part to his inability to practice and develop the skills at home, then requiring ASL immersion at CSDR may be an effective

strategy for him. It certainly raises questions regarding the IEP team's conclusion that J.G.'s "progress toward goals would be similar whether he was placed in CSDR or the CVUSD program." (*Id.* at 754). BPUSD cannot have it both ways: it asserts on one

Ms. Jimenez's testimony also provided illuminating anecdotes regarding J.G.'s communication difficulties, all of which were ignored by the ALJ. (*See, generally,* AR at 748–74). First, Ms. Jimenez described J.G.'s inability to locate the spot to sign his name and write his date of birth on a field trip form. (*See id.* at 1776–77). Next, Ms. Jimenez quoted a text message she received from J.G.: "hurt eye, red, grandma go grandma, here now." (*Id.* at 1780). She also described his inability to carry on a conversation with a classmate on an online social network: "They were asking him, ... I don't remember ... but [J.G.] said 'Yes, ha, ha, ha, laugh out loud, lol,' and he didn't know what they were saying ... And then another kid replying [sic] that he was stupid, stupid dork. And [J.G.] said, '[l]augh out loud. Thank you.'" (*Id.* at 1779). J.G. later asked his mother what D–O–R–K meant. (*Id.* at 1778). The ALJ's Decision did not describe any of this testimony and merely concluded that Ms. Jimenez's opinions "carried less weight than District's witnesses' opinions, based on their academic and relevant professional work experience and their recent assessments of [J.G.]." (*Id.* at 768). The ALJ erred by ignoring and failing to consider or address the entirety of Ms. Jimenez's testimony.

### 2. Testimony of J.G.

Perhaps even worse than ignoring or mischaracterizing Ms. Jimenez's testimony was the ALJ's failure to even mention plaintiff's testimony. (*See, generally,* AR at 748–74). J.G., who was 14 years old at the time, testified on the final day of the Due Process Hearing. (*See* AR at 196772). Had the ALJ considered J.G.'s testimony, there would have been little, if any, doubt as to the scope of the serious difficulties J.G. faces in communicating on a day-to-day basis. (*See id.* at 1967–72). During the hearing, the interpreter needed to translate slowly, and J.G. needed help from his mother with signs. (*See id.* at 1971). J.G. did not appear to understand the questions he was being asked. (*See id.* at 1967–72). For example, when his attorney asked what school he attends, he answered by explaining his morning routine and how he sits with an interpreter in class. (*See id.* at 1969). Apparently perceiving that J.G. did not understand the question, the ALJ told the interpreter to tell J.G. he could "stop his answer there." (*See id.*). When J.G. was asked about the grasshopper and ant fable that Ms. Parres testified J.G. recently read in English (*see id.* at 1202–03), he responded by talking about a frog dissection in his science class. (*See id.* at 1971–72). J.G. was also unable to recall lessons on velocity (*see id.* at 1970) or the computer class budget project, (*see id.* at 1971), which the Districts highlighted as examples of J.G.'s progress and participation at school. (*See id.* at 951–52, 1204–06). J.G.'s testimony at the Due Process Hearing is further supported by his Supplemental Declaration, in which he states the he cannot understand the words he reads or hears. (*See* J.G. Decl., Exh. 1 at 1).

### B. *Other Issues in the Record.*

The ALJ's analysis with respect to J.G.'s academic progress does not appear to be very thorough or give a fair representation of the record. For example, the ALJ cited the Districts' witness testimony regarding J.G.'s good grades and progress with respect to his goals. (*See, e.g.,* AR at 753, 756–59, 766, 768, 772). However, the more the court examined the evidence, the more it became clear that J.G. was not making

---

hand that J.G.'s lack of educational progress is a result of his lack of ASL skills, and on the other, that J.G. benefits from multi-modal instruction at Sierra Vista and does not require ASL immersion at CSDR. (*See id.* at 769).

any real academic progress, particularly considering the fact that he has been enrolled in CVUSD's TCP programs since he was about four years old. (*See id.* at 750). While he made some progress in certain areas, J.G. made less than one year of reading progress between 2009 and 2012: "[t]hree years ago, [J.G.] was not able to read many words at the first grade level. Current assessment results indicate he was able to read most words fluently at the first grade level, but not at the second grade level." (*Id.* at 664). Further, in his May 2012 Triennial Assessment, Ms. Isayo noted that "[c]urrent test findings reveal significant grade level delays in all measured academic skills with a relative strength in mathematics." (*Id.* at 666).

Despite this evidence, the ALJ found that Ms. Jimenez's "testimony that she wanted to 'try something different' was not enough to credibly challenge the Districts' witnesses' opinions regarding [J.G.'s] progress academically and socially in the TCP." (AR at 768). However, Ms. Jimenez's desire to have her son placed at CSDR was not just a matter of "trying something different." As she persuasively testified, "[y]ou've heard the teacher say that, well, gets all technical because they're saying he's in certain grade in this skill but in another skill he's a different grade level, but ... [h]e doesn't know how to read and write English." (*Id.* at 1780). Her concerns are amply supported by the record as a whole, and the ALJ failed to recognize and analyze the complexities presented by the subjective reports of J.G.'s progress on one hand and the objective evidence on the other.

Like the ALJ's failure to take into account J.G.'s and Ms. Jimenez's testimony, the ALJ erred in failing to thoroughly and carefully consider the record as a whole.

In short, the court will give substantially less deference to the ALJ's Decision. *See Gregory K.*, 811 F.2d at 1311 (after considering ALJ's findings, "the court is free to accept or reject the findings in part or in whole.").

## III. BPUSD'S COMPLIANCE WITH IDEA.

 In determining whether J.G. has received a FAPE in compliance with the IDEA, the court conducts a two-step inquiry. First, the court considers whether "the State complied with the procedures set forth in the [IDEA.]" *Rowley*, 458 U.S. at 206, 102 S.Ct. at 3051; *Anchorage Sch. Dist.*, 689 F.3d at 1054. Second, the court evaluates whether the IEP is "reasonably calculated to enable the child to receive educational benefits[.]"[10] *Rowley*, 458 U.S. at 206–07, 102 S.Ct. at 3051.

 The Supreme Court has said that "[w]hen the elaborate and highly specific procedural safeguards embodied in [the IDEA] are contrasted with the general and somewhat imprecise substantive admonitions contained in the Act, we think that the importance Congress attached to these procedural safeguards cannot be gainsaid." *Rowley*, 458 U.S. at 205, 102 S.Ct. at 3050. Accordingly, "procedural inadequacies that result in the loss of educational opportunity, or seriously infringe the parents' opportunity to participate in the IEP formulation process, or that caused a deprivation of educational benefits, clearly result in the denial of a FAPE." *Amanda J.*, 267 F.3d at 892 (internal citations omitted). The procedural provisions regarding parental participation are particularly important. *See id.* at 891; *see also Doug C. v. Hawaii Dept. of Educ.*, 720 F.3d 1038, 1044 (9th Cir.2013) ("proce-

---

10. "It is unnecessary to address the second prong if [the court] identif[ies] procedural inadequacies that result [in the denial of a FAPE.]" *Anchorage Sch. Dist.*, 689 F.3d at 1054 (internal quotation marks omitted).

dural violations that interfere with parental participation in the IEP formulation process undermine the very essence of the IDEA." (internal quotation marks omitted)). This is especially true with respect to placement decisions. *See* 34 C.F.R. § 300.501(c)(1) ("[e]ach public agency must ensure that a parent ... is a member of any group that makes decisions on the educational placement of the parent's child.").

### A. *May 12, 2011, IEP and Addendum Meetings.*

■ The IEP team must include the student's parents, one of the student's regular education teachers, one of the student's special education teachers, and a representative of the public agency who is qualified to provide or supervise the provision of services to the student and who is knowledgeable about the resources available for the student's education. *See* 34 C.F.R. § 300.321(a); *see also* Cal. Educ. Code § 56341(b). At J.G.'s May 12, 2011, IEP meeting, however, no representative of BPUSD was in attendance. (*See* AR at 650). As a result, Ms. Jimenez was unable to discuss with the IEP team a potential placement at CSDR for J.G. (*See id.* at 649) ("Parent is interested in exploring the option of [CSDR]. That discussion will be held at a later meeting date ... when a representative from [BPUSD] will be available to attend and who is authorized to make a decision regarding that placement."). The ALJ's Decision, therefore, that "all persons required by [law] were present at the meeting on behalf of CVUSD" (AR at 766), is incorrect, since the group was clearly missing a representative who was knowledgeable about the resources available for J.G.'s education. *See* 34 C.F.R. § 300.321(a). A representative from BPUSD was required to attend the IEP meeting and it was a violation of plaintiff's rights under the IDEA to tell J.G.'s parents "[t]hat [the] discussion [re-

garding a referral to CSDR] will be held at a later meeting date." (AR at 649).

That Ms. Jimenez consented to the IEP that resulted from the May 12, 2011, IEP, does not change the fact that BPUSD did not comply with its obligations under the IDEA. Due to BPUSD's failure to attend the required IEP meeting and discuss plaintiff's request for a referral to the CSDR, J.G.'s parents were left with a Hobson's choice: accept the proposed IEP without a discussion or decision as to whether J.G. should be referred to the CSDR, or forego the continuation of J.G.'s educational program. What's more, given that BPUSD—the local educational agency responsible for providing J.G. with a FAPE—did not attend the required IEP meeting, the court questions whether the resulting IEP was even valid. Under the circumstances, the court concludes that the May 12, 2011, meeting and resulting IEP contravened the purposes of the IDEA. *See Anchorage Sch. Dist.*, 689 F.3d at 1056 ("But the [school district] could not simply ignore its affirmative duty under the IDEA by postponing its obligation to revise the outdated IEP. Endorsing such an outcome would force [student's] parents to make a Hobson's choice: accept the [school district's] proposed IEP despite its deficiencies or forego even modest improvements to [student's] educational program. Accordingly, we conclude that the [school district's] take it or leave it approach contravened the purposes of the IDEA, which was enacted to ensure that all children with disabilities receive a FAPE, and that the rights of eligible children and their parents are protected.") (citations and internal quotation marks omitted).

The July 15, 2011, meeting—two months after the required IEP meeting—did little to rectify the improper IEP meeting held on May 12, 2011. At this meeting, a

BPUSD representative, Ms. Arellano, did attend. (*See* AR at 651). During this meeting, Ms. Arellano asked Ms. Headcock what she could do to address Ms. Jimenez's concerns if J.G. remained in his current placement. (*See id.* at 653). Ms. Headcock "shared some strategies such as focusing on story-telling in sign language, using small cooperative groups that focus on students with similar communication mode and/or academic functioning level, and building sign language vocabulary." (*Id.*). However, no amendments to J.G.'s IEP were made as a result of the meeting. (*See, generally, id.* at 651–54). Ms. Arellano said she would review J.G.'s needs and progress further and would like to visit CSDR before making a decision. (*See id.* at 653).

The next meeting took place in on August 4, 2011. (*See* AR at 555). Ms. Jimenez, Ms. Arellano, and a general education teacher attended. (*Id.*). Ms. Jimenez was asked, and agreed, to excuse CVUSD staff from this meeting. (*See id.* at 553). As a result, there was no special education teacher present for the discussion. (*See id.* at 555). During this meeting, the group discussed the fact that L.A. County students are only accepted to CSDR if they reside on campus. (*See id.* at 556). Ms. Jimenez asked if J.G. would be able to attend if he lived there, but Ms. Arellano "stated again that BPUSD offers as FAPE DHH program in [CVUSD] as per previous IEP." (*Id.* at 557). There was no further discussion of the referral. (*Id.*). As with the July 2011, addendum meeting, the IEP was not revised. (*See id.* at 558).

The absences of critical BPUSD and CVUSD personnel at these meetings meant that Ms. Jimenez was never able to discuss her concerns about J.G.'s placement with the full IEP team. Instead, she signed the IEP after little discussion, and the IEP was not revised after two subsequent meetings. BPUSD's failure to follow proper procedures in the May 12, 2011, meeting and in the July and August 2011 addendum meetings limited Ms. Jimenez's opportunity for meaningful participation in the IEP formulation process in violation of the IDEA.

### B. *May 11, 2012, IEP.*

At the May 11, 2012, IEP meeting, the Districts refused to discuss Ms. Jimenez's request for a referral to CSDR. (*See* AR at 707). The meeting notes state, "Mom asked for CVUSD's support because she is interested in [J.G.] going to CSDR. District Administrator stated that the IEP team cannot discuss [J.G.'s] placement at this time because of the due process/mediation that is currently ongoing." (*Id.*). Ms. Jimenez testified that she felt her request was being ignored, and that she would have valued the opportunity to discuss J.G.'s teachers' opinions and the pros and cons of a CSDR placement. (*See id.* at 1794–95). Because the Districts refused to discuss the topic, they did not share with Ms. Jimenez that members of the IEP team had a "very comprehensive" tour of CSDR in April 2012. (*See id.* at 565, 1795). Ms. Jimenez testified that had she known, she would have discussed with the teachers and administrators what questions they asked during their tour, what they saw, and what information they obtained about CSDR's curriculum and teaching methods. (*See id.* at 797). Such information would have enabled Ms. Jimenez to engage in a more informed discussion about changes they could have made in J.G.'s IEP at Sierra Vista. (*See id.* at 1797–98) ("[t]hat way, we could work together as a team ... you know, follow up with me, work with me, and I will work with you.").

The ALJ upheld BPUSD's decision to refuse to discuss a referral to

CSDR at the May 11, 2012, meeting, stating as follows:

> Districts' decision to decline discussion on referral to CSDR at the May 11, 2012 IEP meeting because Parents' due process matter was pending was reasonable, and did not deny Parents the opportunity to meaningfully participate in Student's educational program. On the contrary, by filing a due process complaint, Parents were exercising their ultimate right to have the issue of referral to CSDR decided by an administrative law judge.

(AR at 773). The ALJ's Decision, however, misses the point. The IDEA's so-called "stay put" provision, 20 U.S.C. § 1415(j), "enables parents to maintain their child's then-current educational placement during the pendency of any administrative or judicial proceedings, unless the educational agency and the parents agree on an alternative placement." *Anchorage Sch. Dist.*, 689 F.3d at 1054. The stay put provision "was designed to strip schools of the unilateral authority they had traditionally employed to exclude disabled students from school and to protect children from any retaliatory action by the agency." *Id.* at 1056 (internal quotation marks omitted). It was not designed to excuse BPUSD "from its responsibility to have a statutorily compliant IEP in place at the beginning of each school year." *Id.* In other words, the stay put provision did not relieve BPUSD of its obligation to discuss and address Ms. Jimenez's request for a possible referral to CSDR as part of J.G.'s IEP meeting. To allow the stay-put provision to excuse school districts from their obligations to create statutorily compliant IEPs would "vitiate the purpose of the 'stay put' provision," *see id.*, and would be antithetical to the very purposes of the IDEA. Any other approach would chill parents' rights to disagree with the school, because they would then forfeit rights to participate fully in later IEPs. In short,

BPUSD's refusal to discuss plaintiff's request for a possible referral to CSDR as well as its failure to share information that Ms. Jimenez needed to participate meaningfully as a member of the IEP team constituted a violation of the IDEA. *See, e.g., Amanda J.*, 267 F.3d at 893 (finding that the school district prevented parental participation when it "had information in its records, which, if disclosed, would have changed the education approach for [the student].").

### C. *Remedy.*

 Under the Supreme Court's *Rowley* standard, the process through which the local educational agency determines its offer of a FAPE must comply with the IDEA's procedural requirements, and the education must be "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207, 102 S.Ct. at 3051. Failing to meet either (or both) of those requirements is a violation of the IDEA. *Id.* As stated in *Miller*,

> For violations of the IDEA, a district court has the power to grant such relief as it determines is appropriate. Equitable considerations are relevant in fashioning relief under the IDEA. By nature, equitable relief is a fact-specific inquiry in which the Ninth Circuit had held that the conduct of both parties must be reviewed to determine whether relief is appropriate.

318 F.Supp.2d at 859 (internal quotation marks and citations omitted). As described above, BPUSD did not provide J.G. a FAPE under the first prong of the *Rowley* standard because it failed to follow proper procedures in the 2011 and 2012 IEP meetings. Accordingly, the court need not proceed to the second prong regarding educational benefit. *See Amanda J.*, 267 F.3d at 895. However, the court addresses the issue briefly in order to

provide context for its decision regarding the appropriate remedy for J.G.

■ The TCP does not appear to be meeting J.G.'s educational needs. In 2012, after J.G. spent nearly ten years in the program and while he was attending middle school, J.G.'s language skills were still very poor. (*See* AR at 682–83). His functional levels [11] of receptive and expressive language were in the four to seven year old range, and his basal levels [12] of receptive and expressive language were those of a four-year old and a two-year old, respectively.[13] (*See id.*). Although Ms. Weinberg described J.G.'s language progress as "phenomenal," (*see id.* at 1854), her May 2012, assessment states that "[h]e continues to struggle with distinguishing left vs. right, and could only identify 3 of 11 body parts when finger spelled to him." (*Id.* at 682). Further, she explained that sign language "is the primary and pretty much only way we have to convey information to [J.G.]. We use sign language to give him access to the whole curriculum, to any kind of communication." (*Id.* at 1858–59). If J.G. has difficulty identifying body parts and distinguishing left from right even in his primary language, it is unsurprising that J.G. doesn't "understand what people are talking about" at school. (*See* J.G. Decl., Exh. 1 at 1). Moreover, if sign language is the only way that J.G. can access the curriculum, his inability to communicate that way (through ASL, finger spelling, or otherwise) indicates that this program cannot possibly confer much, if any, educational benefit. These unfortunate facts, which exist despite J.G.'s teachers' and therapists' best efforts, underlie the court's finding that J.G. must be referred to CSDR.

■ Although "[a]n appropriate public education does not mean the absolutely best or potential-maximizing education for the individual child, [t]he states are obliged to provide a basic floor of opportunity through a program individually designed to provide educational benefit to the handicapped child." *Ojai*, 4 F.3d at 1474 (internal quotation marks omitted). A referral to CSDR may be J.G.'s best hope for some educational benefit, as J.G.'s 2012 IEP states that he "needs continued exposure to ASL to foster his language development." (*See* AR at 707). A placement at CSDR would enable J.G. to interact with large group of peers using ASL as their primary mode of communication, and he would receive his instruction in ASL. (*See id.* at 1674–76). Even BPUSD has said that increased exposure to ASL is important for J.G., which casts serious doubt on the IEP team's conclusion that J.G.'s "academic instruction and progress towards goals would be similar whether placed in CSDR or CVUSD's program." (*See id.* at 653).

California law regarding the education of deaf students further supports this remedy, as the Education Code states that "[e]ach deaf or hard-of-hearing pupil should receive an education that allows him or her to master a primary language." Cal. Educ.Code § 59001.2(f). It also provides that deaf students should be able to "communicate directly" with their peers,

---

11. "Functional level" means J.G.'s ability to perform, without prompting, 66% of the questions or tasks presented at that level. (*See* AR at 1872).

12. "Basal level" means J.G.'s ability to perform, without prompting, 100% of the questions or tasks presented at that level. (*See* AR at 1872–73).

13. Although J.G.'s "ceiling levels" are around the 11+ year range for receptive language and 7–11 year range for expressive language, Ms. Weinberg testified that the "ceiling level" is the level at which J.G. can perform at least one question or task at that level. (*See* AR at 1873). She stated that J.G. "obviously is nowhere near mastering that level." (*See id.*).

and that their "unique communication mode [should be] respected, utilized, and developed." *Id.* at §§ 56000.5(b)(2) & (4). Further, the Education Code states that "[a] pupil may be referred, as appropriate, for further assessment and recommendations to the California Schools for the Deaf[.]" *Id.* at § 56326. A student who demonstrates the following may be eligible for enrollment: (a) "the ability to learn and/or use [ASL] as the primary mode of communication to access instruction[;]" (b) "that his or her primary educational needs are related to a severe hearing loss[;]" (c) "that he or she can benefit educationally from an ASL environment[;]" and (d) "the ability to access the general education or alternative curriculum with reasonable accommodations." *See* 5 C.C.R. § 17662. Even the topics that *must* be discussed at IEP meetings for deaf students suggests that the potential benefits of CSDR instruction should now be considered by the full IEP team.[14]

The court recognizes that a referral does not mean that J.G. will be accepted to, or that he will necessarily attend, CSDR. However, given the record in this case, the court finds it appropriate that the entire IEP team, including Ms. Jimenez and the CSDR staff, have the opportunity to make an informed decision as to whether or not CSDR is the appropriate placement for J.G.

### CONCLUSION

Based on the foregoing, IT IS ORDERED THAT:

1. The decision of the OAH denying relief for J.G. is **reversed.**

2. BPUSD shall forthwith refer J.G. to CSDR. Thereafter, an IEP meeting must be convened to discuss the results of the referral to CSDR.

3. Judgment shall be entered accordingly.

4. The parties shall meet and confer in a good faith effort to resolve the issue of an award of attorney's fees and costs of court in this action.

5. If agreement cannot be reached, plaintiff shall serve and file a motion for attorney's fees and costs of court pursuant to 20 U.S.C. § 1415, no later than **April 10, 2015.**

---

14. The IEP team must discuss (1) the "pupil's primary language mode and language, which may include the use of spoken language with or without visual cues, or the use of sign language, or a combination of both", (2) the "[a]vailability of a sufficient number of age, cognitive, and language peers of similar abilities", (3) "[a]ppropriate, direct, and ongoing language access to special education teachers and other specialists who are proficient in the pupil's primary language mode and language", and (4) "[s]ervices necessary to ensure communication-accessible academic instructions, school services, and extracurricular activities." Cal. Educ.Code § 56345(d).