# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ANCHORAGE SCHOOL DISTRICT,
     *Plaintiff-Appellee,*

    v.

M.P., a student with a disability
and M.P., his parent,
    *Defendants-Appellants.*

No. 10-36065

D.C. No.
3:09-cv-00189-TMB

ORDER AND
OPINION

Appeal from the United States District Court
for the District of Alaska
Timothy M. Burgess, District Judge, Presiding

Argued and Submitted
October 11, 2011—Seattle, Washington

Filed July 19, 2012

Before: Alex Kozinski, Chief Judge, Richard A. Paez,
Circuit Judge, and Larry A. Burns, District Judge.*

Opinion by Judge Paez

---

 *The Honorable Larry A. Burns, United States District Judge for the
Southern District of California, sitting by designation.

## COUNSEL

Bradley D. Owens (argued) and Howard S. Trickey, Jermain Dunnagan & Owens, P.C., Anchorage, Alaska, for the plaintiff-appellee.

Nicholas G. Miranda (argued), Morrison & Foerster LLP, Washington, D.C.; Sonja D. Kerr, Public Interest Law Center of Philadelphia, Philadelphia, Pennsylvania, for the defendants-appellants.

Edward Daniel Robinson, Covington & Burling, LLP, San Francisco, California, for the amicus curiae.

## ORDER

The Council of Parent Attorneys and Advocates' request for publication is GRANTED. The memorandum disposition filed on November 1, 2011 is withdrawn and is replaced with an opinion filed concurrently with this order.

Appellee shall have 14 days from the date of the filing of this order within which to file a petition for rehearing or rehearing *en banc*. Ninth Circuit Rule 40-2.

---

## OPINION

PAEZ, Circuit Judge:

M.P., through his parents, appeals the district court's ruling that the Anchorage School District ("ASD") did not deny M.P. a free and appropriate public education ("FAPE") because the failure to develop an updated Individualized Education Program ("IEP") was mostly attributable to his "parents' litigious approach." The Individuals with Disabilities Education Act ("IDEA") mandates that public educational agencies review and revise annually an eligible child's IEP. 20 U.S.C. § 1414(d)(2)(A), (4)(A); 34 C.F.R. §§ 300.323(a), 300.324(b)(1). Neither the IDEA nor its implementing regulations condition this—or any other—duty expressly imposed on a state or local educational agency upon parental cooperation or acquiescence in the agency's preferred course of action. Penalizing M.P.'s parents—and consequently M.P.—for exercising the very rights conferred by the IDEA undermines the statute's fundamental purposes.

Although the district court relied on an improper basis when it declined to consider whether the ASD complied with the IDEA's substantive requirements, it is unnecessary to remand this issue. In light of the fully developed record, we

conclude that the ASD deprived M.P. of a substantively adequate FAPE by relying on an outdated IEP to measure M.P.'s academic and functional performance and provide educational benefits to M.P. We further conclude that M.P.'s parents are entitled to reimbursement for private tutoring expenses incurred from January 1, 2008 to December 2008, and review of the propriety of private tutoring expenses incurred from January 1, 2009 through May 2009. Accordingly, we reverse in part and remand for further proceedings consistent with this opinion.

## I.

M.P. is eligible for special education and related services because he has been diagnosed with high-functioning autism, pervasive development delay, and sensory integration dysfunction. M.P.'s parents have been actively involved in their son's education. The record reflects that they vigorously pursued the rights and remedies provided under the IDEA: they routinely reported their concerns regarding M.P.'s educational progress to the IEP team; they zealously advocated for amendments to M.P.'s IEP; they requested that the ASD provide supplemental services that extend beyond the traditional educational curriculum provided in the classroom; and they filed numerous due process complaints that predate this lawsuit. Their actions, however, have contributed to an increasingly strained relationship with the ASD.

This particular dispute arises out of an IEP adopted by the ASD in 2006 with the consent of M.P.'s parents. The IEP, which expired by its own terms a year later, established academic, occupational therapy, speech and language, and behavioral goals for M.P. during his second grade year at the ASD's Denali Montessori School ("Denali"). Pursuant to the 2006 IEP, M.P. received educational instruction in a regular classroom environment with special education support and services from a special education teacher, a teacher's assistant,

an occupational therapist, and a speech and language pathologist.

M.P. completed the second grade curriculum and moved on to third grade for the 2007-08 academic year. There were attempts to revise the 2006 IEP, but the parties were unable to develop an updated IEP prior to its expiration on August 25, 2007. Approximately halfway through M.P.'s third grade year, the ASD prepared a revised IEP for M.P. M.P.'s parents did not attend the meeting during which the ASD formulated the draft IEP, although they were invited. Instead, they provided written comments and suggestions that they wanted incorporated into the proposed IEP. They also identified those portions of the IEP that should remain in "stay put," *see* 20 U.S.C. § 1415(j) (providing that during the pendency of judicial or administrative hearings, "the child shall remain in the then-current educational placement" unless the parents and the school district agree to an alternative placement), in accordance with a stipulation between M.P.'s parents and the ASD in the then-pending administrative proceeding, *Anchorage Sch. Dist.*, DEED 07-20, 50 IDELR 146, 626 (Alaska IHO Jan. 8, 2008). Pursuant to the parties' stipulation, the hearing officer ordered the ASD to maintain M.P.'s writing instruction placement for the remainder of the 2006-07 school year. *Id.* at 626; *see also Madeline P. v. Anchorage Sch. Dist.*, 265 P.3d 308, 313 (Alaska 2011). Relying on the "stay put" order, M.P.'s parents sought to maintain their son's then-current educational placement for writing instruction in the draft February 2008 IEP. However, after receiving the parents' response, the ASD unilaterally postponed any further efforts to develop an updated IEP until after a final decision had been rendered in the state court appeal of the hearing officer's split decision in the administrative proceeding, *Anchorage Sch. Dist.*, DEED 07-20, 50 IDELR 146, 625 (Alaska IHO Jan. 8, 2008).

For the 2008-09 academic year, M.P.'s parents enrolled M.P. in Kincaid Elementary School ("Kincaid"), which was

also part of the ASD. M.P.'s parents declined to meet with staff from Denali and Kincaid to discuss M.P.'s transition to the new school. At Kincaid, M.P. repeated the third grade at the request of his parents and with the consent of Kincaid's principal. Due to the continuing impasse over the February 2008 draft IEP, the Kincaid staff relied on the 2006 IEP but provided M.P. with third grade lessons and materials.

This lawsuit springs from an administrative due process complaint filed by M.P.'s parents in September 2008 regarding whether M.P. received educational benefits under the 2006 IEP for the 2008 calendar year. After an eight-day hearing involving twelve witnesses, the hearing officer concluded that the ASD failed to provide M.P. with a FAPE because he had regressed in two core subject areas—math and reading—and in several of his behavioral goals. The hearing officer therefore awarded full reimbursement for the math and reading tutoring expenses M.P.'s parents incurred from January 1, 2008 to December 2008. She also authorized M.P.'s parents to submit their bills from January 1, 2009 through May 2009 for review by the IEP team and the ASD to determine whether that tutoring assisted M.P. in progressing toward his 2006 IEP goals. She further ordered the IEP team to convene a meeting within twenty days to review M.P.'s goals and objectives and directed that M.P. be tested to determine his ability level in various academic subjects. Finally, the hearing officer ordered the parties to participate in mediation to resolve their communication problems.

In September 2009, the ASD sought judicial review of the hearing officer's decision by filing this lawsuit. Both parties filed cross-motions for summary judgment. The district court granted the ASD's summary judgment motion in part and reversed the hearing officer's decision because it concluded that the ASD did not deny M.P. a FAPE. The district court concluded that, although the 2006 IEP was obsolete and outdated, the failure to develop an updated IEP was mostly attributable to M.P.'s parents' litigious approach. It also deter-

mined that M.P.'s parents were not entitled to reimbursement for the tutoring expenses they incurred on M.P.'s behalf. The court, however, affirmed the hearing officer's decision that the IEP team convene an IEP meeting, that M.P. be tested, and that the parties engage in mediation. The district court further determined that neither party was entitled to an award of attorney's fees or costs.

## II.

Under the IDEA, federal courts accord considerably less deference to state administrative proceedings than they do in most instances of "judicial review of . . . agency actions, in which courts generally are confined to the administrative record and are held to a highly deferential standard of review." *E.M. ex rel. E.M. v. Pajaro Valley Unified Sch. Dist. Office of Administrative Hearings*, 652 F.3d 999, 1005 (9th Cir. 2011) (internal quotation marks omitted). The statute empowers the reviewing court to hear evidence that goes beyond the scope of the administrative record and, based on a preponderance of the evidence, "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). "Complete *de novo* review, however, is inappropriate." *Amanda J. ex rel. Annette J. v. Clark Cnty. Sch. Dist.*, 267 F.3d 877, 887 (9th Cir. 2001). Administrative proceedings are accorded "due weight" and the reviewing court must, at least, "consider the findings carefully[.]" *R.B. ex rel. F.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 937 (9th Cir. 2007) (internal quotation marks omitted). An administrative hearing officer's "thorough and careful" findings receive particular deference. *Id.*

We review a district court's factual findings for clear error, even when they are based on the administrative record. *J.G. v. Douglas Cnty. Sch. Dist.*, 552 F.3d 786, 793 (9th Cir. 2008). Questions of law are reviewed de novo, as are mixed questions of law and fact unless the mixed question is primar-

ily factual. *N.B. v. Hellgate Elementary Sch. Dist.*, 541 F.3d 1202, 1207 (9th Cir. 2008).

We review a district court's equitable determination as to reimbursement of expenses for abuse of discretion. *C.B. ex rel. Baquerizo v. Garden Grove Unified Sch. Dist.*, 635 F.3d 1155, 1159 n.1 (9th Cir. 2011). We also review for abuse of discretion a district court's denial of a request for attorney's fees. *P.N. v. Seattle Sch. Dist., No. 1*, 474 F.3d 1165, 1168 (9th Cir. 2007).

## III.

### A.

In enacting the IDEA, Congress sought "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living[.]" 20 U.S.C. § 1400(d)(1)(A). The statute was intended to address the inadequate educational services offered to children with disabilities and to combat the exclusion of such children from the public school system. *Id.* § 1400(c)(2)(A)-(B). To accomplish these objectives, the federal government provides funding to participating state and local educational agencies, which is contingent on the agency's compliance with the IDEA's procedural and substantive requirements.

Parents and children with disabilities are accorded substantial procedural safeguards to ensure that the purposes of the IDEA are fully realized. *See, e.g.*, *Bd. of Educ. v. Rowley*, 458 U.S. 176, 205-06 (1982). Among other protections, parents are entitled to examine their child's records and participate in meetings concerning their child's education, 20 U.S.C. § 1415(b)(1); receive written notice prior to any proposed change in the educational placement of their child, *id.*

§ 1415(b)(3); and file an administrative due process complaint "with respect to any matter relating to the identification, evaluation, or educational placement of [their] child, or the provision of a free appropriate public education to such child[,]" *id.* § 1415(b)(6). When parents or the school district pursue an administrative complaint, they are entitled to "an impartial due process hearing" conducted by the state or local educational agency. *Id.* § 1415(f)(1)(A). Either party may seek judicial review in state or federal court. *Id.* § 1415(i)(2)(A). The "stay put" provision of the IDEA enables parents to maintain their child's then-current educational placement during the pendency of any administrative or judicial proceedings, unless the educational agency and the parents agree on an alternative placement. *Id.* § 1415(j); 34 C.F.R. § 300.518(a).

**[1]** State and local educational agencies must also satisfy the IDEA's substantive requirements by providing all eligible students with a free appropriate public education, or FAPE, which is defined as:

> special education and related services that — (A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under [20 U.S.C. § 1414(d)].

20 U.S.C. § 1401(9). The components of a FAPE are recorded in an IEP, which, among other things, identifies the child's "present levels of academic achievement and functional performance," establishes measurable annual goals, addresses the services and accommodations to be provided to the child and whether the child will attend mainstream classes, and specifies the measurement tools and periodic reports that will be used to evaluate the child's progress. *Id.* § 1414(d)(1)(A); 34

C.F.R. § 300.320. The team that develops an IEP must consist of, at a minimum, the parents, at least one of the child's regular education teachers, at least one special education teacher, and a qualified representative of the local educational agency. 20 U.S.C. § 1414(d)(1)(B); 34 C.F.R. § 300.321(a). The IEP team must review and, as appropriate, revise the IEP on an annual basis. 20 U.S.C. § 1414(d)(2)(A), (4)(A); 34 C.F.R. §§ 300.323(a), 300.324(b)(1).

We conduct a two-step inquiry to determine whether a child has received a FAPE. First, we consider whether "the State complied with the procedures set forth in the [IDEA.]" *Rowley*, 458 U.S. at 206. Second, we evaluate whether the IEP is "reasonably calculated to enable the child to receive educational benefits[.]" *Id.* at 206-07. It is unnecessary to address the second prong if we identify "procedural inadequacies that result in the loss of educational opportunity, or seriously infringe the parents' opportunity to participate in the IEP formulation process, or that caused a deprivation of educational benefits[.]" *Amanda J.*, 267 F.3d at 892 (internal quotation marks and citations omitted).

## B.

M.P.'s parents contend that the district court erred by declining to consider whether M.P. received a FAPE because his parents were equally or more at fault for the absence of an updated IEP. We agree that the district court improperly shifted the burden for substantive compliance with the IDEA from the ASD to M.P.'s parents.

**[2]** The ASD has an affirmative duty to review and to revise, at least annually, an eligible child's IEP. *See, e.g.*, 20 U.S.C. § 1414(d)(2)(A), (4)(A); 34 C.F.R. §§ 300.323(a), 300.324(b)(1). Nothing in the statute makes that duty contingent on parental cooperation with, or acquiescence in, the state or local educational agency's preferred course of action.[1]

---

[1]For example, even when an educational agency "is unable to convince the parents that they should attend" an IEP team meeting, 34 C.F.R.

To the contrary, the IDEA, its implementing regulations, and our case law all emphasize the importance of parental involvement and advocacy, even when the parents' preferences do not align with those of the educational agency. The statute is particularly protective of parents' right to participate in the formulation of their child's IEP because "[p]arents not only represent the best interests of their child in the IEP development process, they also provide information about the child critical to developing a comprehensive IEP and which only they are in a position to know." *Amanda J.*, 267 F.3d at 882. When parents are dissatisfied with any aspect of the educational services provided to their child, the IDEA authorizes them to pursue an administrative—and then, if necessary, a civil—remedy. 20 U.S.C. § 1415(b)(6), (f)(1)(a), (i)(2)(A). During the pendency of administrative and civil proceedings, the statute permits parents to ensure that their child's educational placement is not disrupted without their consent by invoking the statute's "stay put" provision. *Id.* § 1415(j); 34 C.F.R. § 300.518(a).

**[3]** We have previously held that participating educational agencies cannot excuse their failure to satisfy the IDEA's procedural requirements by blaming the parents. In *W.G. v. Board of Trustees of Target Range School Dist. No. 23*, the school district committed a procedural violation by failing to ensure parental participation in the development of their child's IEP. 960 F.2d 1479, 1485 (9th Cir. 1992), *superseded on other grounds by* 20 U.S.C. § 1414(d)(1)(B). The school district argued that the parents were at fault because "they left the IEP meeting, did not file a dissenting report," and did not

_____

§ 300.322(d), the implementing regulations do not permit the state or local educational agency to cancel the meeting. Rather, the agency must document its efforts to communicate with the parents and then the meeting may be conducted in the parents' absence, but only if the parents affirmatively refuse to attend. *Id.*; *see, e.g.*, *Shapiro ex rel. Shapiro v. Paradise Valley Unified Sch. Dist. No. 69*, 317 F.3d 1072, 1078 (9th Cir. 2003), *superseded on other grounds by* 20 U.S.C. § 1414(d)(1)(B).

adequately communicate their concerns to the school district. *Id.* We rejected the school district's rationale, concluding that it had an affirmative duty to conduct a "meaningful meeting with the appropriate parties[,]" and that it failed to do so when it did not ensure parental participation in the development of the IEP. *Id.*

**[4]** We likewise held that a school district did not fulfill its statutory obligation to evaluate a child with disabilities when it merely referred the child's parents to a center for an evaluation. *See N.B.*, 541 F.3d at 1209. We concluded that a referral "does not 'ensure the child is assessed,' as required by 20 U.S.C. § 1414(b)(3)(C)." *Id.* These cases demonstrate that an educational agency "cannot abdicate its affirmative duties under the IDEA." *Id.*

**[5]** Here, it is beyond dispute that M.P.'s parents were zealous advocates for their son. Due to their ongoing concerns about the adequacy of the educational opportunities and services provided by the ASD, M.P.'s parents filed four administrative complaints in August and September 2008 and obtained a "stay put" order in connection with a then-pending administrative proceeding. Having reviewed the record, we are aware that this zealousness probably contributed to their strained relationship with the ASD. Yet it would be antithetical to the IDEA's purposes to penalize parents—and consequently children with disabilities—for exercising the very rights afforded to them under the IDEA. *See* 20 U.S.C. § 1400(d)(1)(B) (explaining that one of the IDEA's purposes is "to ensure that the rights of children with disabilities and parents of such children are protected").

**[6]** Therefore, when the ASD received M.P.'s parents' extensive revisions to the ASD's February 2008 draft IEP, the ASD had two options: (1) continue working with M.P.'s parents in order to develop a mutually acceptable IEP, or (2) unilaterally revise the IEP and then file an administrative complaint to obtain approval of the proposed IEP. *See* 20

U.S.C. § 1415(b)(6); 34 C.F.R. § 300.507(a) ("A parent or a public agency may file a due process complaint . . . ."); *see also A.M. ex rel. Marshall v. Monrovia Unified Sch. Dist.*, 627 F.3d 773, 778 (9th Cir. 2010) (noting that the parents and the school district both requested a due process hearing). But the ASD could not simply ignore its affirmative duty under the IDEA by postponing its obligation to revise the outdated IEP. *Cf. N.B.*, 541 F.3d at 1209. Endorsing such an outcome would force M.P.'s parents to make a Hobson's choice: accept the ASD's proposed IEP despite its deficiencies or forego even modest improvements to M.P.'s educational program. Accordingly, we conclude that the ASD's "take it or leave it" approach contravened the purposes of the IDEA, which was enacted to ensure that all children with disabilities receive a FAPE, and that the rights of eligible children and their parents are protected. 20 U.S.C. §§ 1400(d)(1)(A)-(B).

**[7]** We acknowledge that the ASD's ability to revise the IEP was necessarily constrained by the "stay put" order, which required that the ASD maintain M.P.'s writing educational placement for the duration of the 2006-07 academic year. But the mere existence of the "stay put" order did not excuse the ASD from its responsibility to have a statutorily compliant IEP in place at the beginning of each school year. 20 U.S.C. § 1414(d)(2)(A); 34 C.F.R. § 300.323(a). Indeed, to conclude otherwise would vitiate the purpose of the "stay put" provision, which was designed to "strip schools of the 'unilateral authority they had traditionally employed to exclude disabled students . . . from school' and to protect children from any retaliatory action by the agency." *Johnson ex rel. Johnson v. Special Educ. Hearing Office*, 287 F.3d 1176, 1181 (9th Cir. 2002) (quoting *Honig v. Doe*, 484 U.S. 305, 323 (1988)).

**[8]** The "stay put" order meant only that the ASD could not change M.P.'s "educational placement," which we have held "means the general educational program of the student." *N.D. ex rel. Parents Acting as Guardians Ad Litem v. Haw. Dep't of Educ.*, 600 F.3d 1104, 1116 (9th Cir. 2010). We have

explained that "a change in educational placement relates to whether the student is moved from one type of program—i.e., regular class—to another type—i.e., home instruction." *Id.* Or it may also occur "when there is a significant change in the student's program even if the student remains in the same setting." *Id.* For purposes of our discussion, it is not necessary to further define this term. We emphasize only that the ASD can satisfy its statutory obligations to review and revise M.P.'s IEP without effecting a change in his educational placement for writing instruction. Thus, we hold that updating an eligible student's present level of academic achievement and functional performance and establishing corresponding goals and objectives does not qualify as a change to a student's educational placement, so long as such revisions do not involve changes to the academic setting in which instruction is provided or constitute significant changes in the student's educational program.

This outcome is consistent with the manner in which Congress addressed the concern of overly demanding parents. *See* 20 U.S.C. § 1412(a)(10)(C)(iii)(III) (providing that a court may reduce or deny reimbursement for private school placement costs "upon a judicial finding of unreasonableness with respect to actions taken by the parents"); *id.* § 1415(i)(3)(B)(i)(II) (providing for an award of attorney's fees to a prevailing educational agency when the parent's attorney files or continues to litigate a frivolous, unreasonable, or baseless cause of action); *id.* § 1415(i)(3)(B)(i)(III) (permitting an award of attorney's fees to a prevailing educational agency and against either the parent or the parent's attorney when "the parent's complaint or subsequent cause of action was presented for any improper purpose, such as to harass, to cause unnecessary delay, or to needlessly increase the cost of litigation"); *id.* § 1415(i)(3)(F) (authorizing a court to reduce an award of attorney's fees in matters in which the parent or the parent's attorney "unreasonably protracted the final resolution of the controversy"). Each of these authorized sanctions penalizes the parents or their attorney—not their

children. These safeguards provide a sufficient deterrent to unreasonably demanding or litigious parents.

## C.

M.P.'s parents also argue that M.P. did not receive a FAPE during the 2008 calendar year. Although the district court did not reach the issue of substantive compliance, we conclude that justice would not be served by further delaying the resolution of this issue. In light of the fully developed record on appeal, we hold that the ASD denied M.P. a FAPE.

[9] To provide a FAPE, the educational agency must ensure that the child's IEP is "reasonably calculated to enable the child to receive educational benefits[.]" *Rowley*, 458 U.S. at 207. The Supreme Court has interpreted this standard to mean that "states must provide a 'basic floor of opportunity' to disabled students, not a 'potential-maximizing education.' " *J.L. v. Mercer Island Sch. Dist.*, 592 F.3d 938, 947 (9th Cir. 2010) (quoting *Rowley*, 458 U.S. at 197 n.21, 200). A state or local educational agency satisfies the "educational benefit" standard "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction."[2] *Rowley*, 458 U.S. at 203. When a child with disabilities remains in a regular classroom with his or her peers, an IEP "should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." *Id.* at 204. We are mindful that we must not critique an IEP with the benefit of hindsight—instead, we evaluate whether the goals and methods were reasonably calculated to ensure that the child would receive educational

---

[2]In *J.L.*, we recognized that there is confusion as to whether children with disabilities are entitled to an IEP that provides "educational benefit," "some educational benefit" or a "meaningful educational benefit." 592 F.3d at 951 n.10. We concluded that all three iterations refer to the same standard because "[s]chool districts must, to 'make such access meaningful,' confer at least 'some educational benefit' on disabled students." *Id.* (quoting *Rowley*, 458 U.S. at 192, 200).

benefits at the time of implementation. *Adams v. Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999).

**[10]** M.P.'s third grade teachers and special education staff at both Denali and Kincaid relied on an IEP that was developed and implemented in 2006 for M.P.'s second grade school year. We agree with the district court and the hearing officer that the 2006 IEP was outdated and obsolete, and that it either lacked benchmarks or the benchmarks were outdated. Consequently, an exhaustive recitation of the hearing officer's factual findings is unnecessary. We conclude that an IEP developed for a second grader is not reasonably calculated to ensure educational benefits to that student in his third grade year. Even if M.P.'s teachers and aides attempted to overlay third grade expectations onto the 2006 IEP's goals and objectives, it is unclear whether their efforts were appropriate or adequate because the 2006 IEP did not provide an accurate assessment of M.P.'s present level of performance during his third grade year. We are simply not persuaded that an IEP designed to address second grade educational standards and objectives was reasonably calculated to enable M.P. to achieve passing marks in his third grade year and then advance to fourth grade. Accordingly, we agree with the hearing officer's factual findings and conclude that the ASD deprived M.P. of a FAPE because the outdated IEP does not satisfy the *Rowley* "educational benefit" standard.[3]

## D.

M.P.'s parents also challenge the district court's denial of their request for reimbursement for the private tutoring expenses they incurred on M.P.'s behalf from January 1, 2008 to May 2009. The district court foreclosed any possibility of granting such relief, holding that the ASD did not deny M.P. a FAPE and, even if it had, his parents were not entitled to

---

[3]Because the ASD denied M.P. a substantively adequate FAPE, we do not address M.P.'s procedural claims.

reimbursement. The district court abused its discretion by summarily concluding that M.P.'s parents were not entitled to reimbursement even if the ASD denied M.P. a FAPE. *See C.B.*, 635 F.3d at 1159 n.1 (explaining that we review an equitable determination of reimbursement for abuse of discretion).

**[11]** The IDEA permits a district court to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). We have held that "[p]arents have an equitable right to reimbursement for the cost of providing an appropriate education when a school district has failed to offer a child a FAPE." *W.G.*, 960 F.2d at 1485. Even if a parent prevails on an IDEA claim, however, reimbursement is not automatic and the Supreme Court has repeatedly cautioned that "parents who unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials, do so at their own financial risk." *Sch. Comm. of Burlington v. Dep't of Educ. of Mass.*, 471 U.S. 359, 373-74 (1985). The Court has further explained that reimbursement for such expenses is appropriate *only* if (1) the school district's placement violated the IDEA, and (2) the alternative placement was proper under the statute. *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 15 (1993). "If both criteria are satisfied, the district court then must exercise its 'broad discretion' and weigh 'equitable considerations' to determine whether and how much, reimbursement is appropriate." *C.B.*, 635 F.3d at 1159 (quoting *Carter*, 510 U.S. at 15-16). In making this determination, the district court may consider all relevant equitable factors, including, *inter alia*, notice to the school district before initiating the alternative placement; the existence of other, more suitable placements; the parents' efforts in securing the alternative placement; and the level of cooperation by the school district. *Forest Grove Sch. Dist. v. T.A.*, 523 F.3d 1078, 1088-89 (9th Cir. 2008). These factors make clear that "[t]he conduct of *both* parties must be reviewed to determine whether relief is appropriate." *W.G.*, 960 F.2d at 1486 (emphasis added).

For the reasons explained above, M.P.'s parents satisfied the first criterion because the ASD denied M.P. a FAPE by relying on the outdated 2006 IEP. Furthermore, M.P.'s parents met the second criterion—the private tutoring services were proper under the IDEA—but only from January 1, 2008 to December 2008. The record does not shed much light on the scope and substance of M.P.'s private tutoring services, but the evidence supports a finding that M.P. achieved measurable progress as a result of private tutoring, at least with respect to math. Moreover, it does not appear that the ASD challenged the suitability of such services during the administrative proceedings. The hearing officer's findings were both thorough and careful, and we defer to her determination that M.P.'s 2006 IEP, as implemented during his third grade year at Denali and Kincaid, did not enable him to attain the statutorily required educational benefits in math and reading to which he was entitled. We therefore affirm the hearing officer's sound determination that M.P. was entitled to the private tutoring services he received in these core academic areas from January 1, 2008 to December 2008.

[12] Turning to the equitable considerations in this case, we conclude that the hearing officer's decision and the record support an award of full reimbursement for M.P.'s private tutoring expenses. The district court identified three relevant factors: lack of notice to the school district; whether the school district was asked to provide services to the student and given a reasonable opportunity to complete the process of evaluation and make a placement recommendation; and the school district's level of cooperation. Because the district court did not analyze these factors, we are unable to determine the weight it accorded to each one. Yet the second and third factors strongly militate against the district court's conclusion. The ASD failed to timely update M.P.'s 2006 IEP. When M.P.'s parents responded to the draft IEP proposed by the ASD in February 2008, the school district unilaterally terminated all efforts to revise the outdated and obsolete IEP for M.P.'s third grade year. Therefore, the ASD's refusal to coop-

erate in updating the IEP necessarily contributed to the parents' need to secure private tutoring services for their son. As we have previously stated, we are sympathetic to the difficulties posed by the obviously strained relationship between the ASD and M.P.'s parents, but this circumstance does not excuse the ASD from compliance with the IDEA. To conclude otherwise would subvert the purposes of the IDEA and sanction a school district's unilateral decision to abandon its statutorily required responsibility to the detriment of its students.

We conclude that the hearing officer properly determined that M.P.'s parents are entitled to full reimbursement for M.P.'s private tutoring services in math and reading for the 2008 calendar year. We likewise defer to the hearing officer's determination that M.P.'s parents are entitled to submit for review by the IEP team and the ASD the expenses incurred from January 1, 2009 through May 2009 so that his parents may be reimbursed for those tutoring services that were appropriate under the IDEA.

## E.

Finally, M.P.'s parents argue that the district court erred by rejecting their request for an award of attorney's fees. Although the district court concluded that M.P. was not denied a FAPE, his parents contend that they nonetheless prevailed in the administrative proceedings and obtained some affirmative relief from the district court. While we were considering a request for publication of our memorandum disposition, however, the parties reached a global settlement resolving the issue of attorney's fees in all related matters, including this case. Thus, it appears that this issue is moot. If we are mistaken, the district court may revisit the issue of attorney's fees upon remand.

**REVERSED IN PART AND REMANDED.**