**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

<table>
<tr>
<td>

L.B., By and Through his Guardian Ad Litem ROBIN MORRISEY,

*Plaintiff - Appellant*,

v.

SAN DIEGO UNIFIED SCHOOL DISTRICT,

*Defendant - Appellee*.

</td>
<td>

No. 24-5543

D.C. No. 3:23-cv-00528-AJB-DDL

OPINION

</td>
</tr>
</table>

Appeal from the United States District Court
for the Southern District of California
Anthony J. Battaglia, District Judge, Presiding

Argued and Submitted October 8, 2025
Pasadena, California

Filed February 27, 2026

Before: Kim McLane Wardlaw, Ronald M. Gould, and
Lucy H. Koh, Circuit Judges.

Opinion by Judge Wardlaw

# SUMMARY[*]

## Individuals with Disabilities Education Act

The panel reversed the district court's affirmance of an administrative law judge's determination that student L.B. was not entitled to reimbursement under the Individuals with Disabilities Education Act from the San Diego Unified School District ("SDUSD") for special education expenses he incurred while attending two private residential treatment centers in middle school.

L.B.'s parents claimed that SDUSD failed to offer L.B. a free appropriate public education during the time he was enrolled in the residential treatment centers after struggling with significant challenges while enrolled in SDUSD during the COVID-19 pandemic. The district court held that SDUSD had no duty to offer L.B. a free appropriate public education during this period because his parents did not request an individualized education program ("IEP") document for L.B., but only an IEP meeting.

Distinguishing *Capistrano Unified School District v. S.W.*, 21 F.4th 1125 (9th Cir. 2021), the panel held that the very purpose of an IEP meeting under federal and California state law is for the student's IEP team, consisting of his parents and specified teachers and school officials, to develop and offer an IEP that will provide a free appropriate public education. Whether L.B.'s parents requested an IEP using the words "IEP meeting" or "IEP document" therefore was irrelevant. The panel remanded to the district court for

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

further proceedings regarding whether the IEP program that SDUSD offered L.B. during his private placement met the requirements of a free appropriate public education and, if not, whether L.B. was entitled to reimbursement or other remedies for his consequent private placement.

## COUNSEL

Meagan Nunez (argued), Law Office of Meagan Nunez, San Diego, California, for Plaintiff-Appellant.

Jonathan P. Read (argued) and Shiva E. Stein, Fagen Friedman Fulfrost LLP, Carlsbad, California, for Defendant-Appellee.

Selene A. Almazan-Altobelli, Council of Parent Attorneys and Advocates, Towson, Maryland; Ellen M. Saideman, Law Office of Ellen Saideman, Barrington, Rhode Island; Alexis Casillas, Law Offices of Alexis Casillas PLC, San Marino, California; for Amicus Curiae Council of Parent Attorneys and Advocates.

**OPINION**

WARDLAW, Circuit Judge:

L.B., by and through his Guardian Ad Litem, Robin Morrisey, appeals the district court's affirmance of an Administrative Law Judge's determination that he was not entitled to reimbursement from the San Diego Unified School District ("SDUSD") under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq.*, for special education expenses he incurred while attending two private residential treatment centers in middle school. L.B.'s parents ("Parents") first met with SDUSD officials in 2019 to create an "Individualized Education Program" ("IEP")[1] for L.B.'s mental health needs. Parents accepted the IEP for L.B., but found, a few weeks into the 2020–21 school year, that it was not meeting L.B.'s educational, emotional, and mental health needs. L.B. struggled with significant challenges while enrolled in SDUSD during the COVID-19 pandemic, in which SDUSD offered only virtual learning. Parents thus enrolled L.B. in two successive out-of-state residential treatment centers that allowed for in-person education and mental health services.

While L.B. was enrolled in the residential treatment centers, Parents attended several meetings with L.B.'s IEP Team at SDUSD, which consisted of Parents and statutorily specified SDUSD officials. Parents later sought reimbursement from SDUSD for the costs of enrollment in the residential treatment centers, claiming that SDUSD had

---

[1] An "IEP" is "a written statement for each child with a disability that is developed, reviewed, and revised" by an "IEP Team," consisting of the parents and statutorily specified members of the school and school district. 20 U.S.C. § 1414(d)(1)(A)(i), (B).

failed to offer L.B. a free appropriate public education ("FAPE") during that time.  But the district court did not determine whether SDUSD's IEP constituted an appropriate public education program during the COVID-19 pandemic.  Instead, the district court held that SDUSD had no duty to offer L.B. a free appropriate public education during this period because Parents did not request an IEP document for L.B., but only an IEP meeting.

We reverse and remand.  We explain that the very purpose of an IEP meeting under federal and California state law is for the IEP Team to develop and offer an IEP that will provide a free appropriate public education.  The question is whether Parents requested that SDUSD provide an IEP that offered L.B. a free appropriate education, as required by federal and state law.  Whether Parents requested an IEP using the words "IEP meeting" or "IEP document" is irrelevant.  Thus, the district court's inquiry into the intent of each meeting was misplaced, as was its analysis of how Parents requested each meeting.  We remand to the district court for further proceedings regarding whether the IEP program SDUSD offered L.B. during his private placement met the requirements of a free appropriate public education and, if not, whether L.B. is entitled to reimbursement or other remedies for his consequent private placement.

## I.  STATUTORY BACKGROUND

The Individuals with Disabilities Education Act ("IDEA") offers federal funds to states conditioned upon the provision of a "free appropriate public education" to children with disabilities residing in the state.  20 U.S.C. § 1412(a)(1)(A).  "The core of the [IDEA] . . . is the cooperative process that it establishes between parents and schools." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53

(2005) (citation omitted). The "primary vehicle" for this collaboration is the "Individualized Education Program," which is "a personalized plan to meet all of the child's educational needs." *Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154, 158 (2017) (citation and internal quotation marks omitted).

An IEP is developed by a child's "IEP Team," consisting of the child's parents and specified teachers and school officials. 20 U.S.C. § 1414(d)(1)(B). The IEP spells out a child's "levels of academic achievement," identifies "measurable annual goals," and lists "special education and related services" that the school plans to provide each school year. *Id.* § 1414(d)(1)(A)(i). Parents play a key role in the IEP process. They are made members of IEP Teams by statute and must be informed about and consent to evaluations of their child, *id.* § 1414(c)(3); they must be provided with written prior notice of any changes in an IEP, *id.* § 1415(b)(3); and must be notified in writing of the procedural safeguards available to them under the IDEA, *id.* § 1415(d)(1)(A). *See Amanda J. ex rel. Annette J. v. Clarke Cnty. Sch. Dist.*, 267 F.3d 877, 882 (9th Cir. 2001) ("Parents not only represent the best interests of their child in the IEP development process, they also provide information about the child critical to developing a comprehensive IEP and which only they are in a position to know.").

Parents who believe the public school has failed to offer their child a FAPE may place their child in an "appropriate" private school and seek reimbursement from the public school for the associated costs. 20 U.S.C. § 1412(a)(10)(C). "[T]he IDEA establishes formal procedures for resolving disputes" between parents and schools. *Fry*, 580 U.S. at 159. If parents believe that a school has denied their child a FAPE, they may present a complaint to the local or state

educational agency. 20 U.S.C. § 1415(b)(6). This pleading triggers a preliminary meeting between the parents and the IEP team to resolve the issues in the complaint. *Id.* § 1415(e), (f)(1)(B)(i). If the complaint is not resolved to the parents' satisfaction, the parents have a right to a "due process hearing" before an administrative law judge. *Id.* §1415(f)(1)(A). A parent may then seek judicial review of the administrative process by filing a civil action in federal court. *Id.* § 1415(i)(2)(A).[2]

## II. FACTUAL BACKGROUND

In 2019, L.B. was a middle school student with a history of serious mental health diagnoses, including suicidal ideation, that required several hospitalizations. At the beginning of the 2019–20 school year, L.B., then a seventh-grade student, was enrolled in the SDUSD. L.B. stopped attending SDUSD in October 2019, however, due to his mental health challenges, and L.B.'s parents placed him at a local private residential treatment center in November 2019.

In December 2019, after Parents met with SDUSD officials, SDUSD prepared its first IEP for L.B. This IEP offered L.B. specialized academic instruction, mental health services, and behavioral intervention services. SDUSD also offered L.B. placement at Riley Alternative School ("Riley"), a San Diego public school that provides intensive mental health services for students with severe social or emotional difficulties. Parents met with their SDUSD IEP Team two additional times that winter, but Parents and

---

[2] The IDEA is a "model of cooperative federalism," and "leaves to the states the primary responsibility for developing and executing educational programs for handicapped children, but imposes significant requirements to be followed in the discharge of that responsibility." *Schaffer*, 546 U.S. at 52 (citation and internal alterations omitted).

SDUSD could not agree to an IEP that both believed would be appropriate for L.B.

In February 2020, Parents filed a request for a due process hearing with the Office of Administrative Hearings ("OAH"). Two months later, Parents and SDUSD entered into a settlement agreement that stipulated, among other requirements, that Parents would agree to the IEP that SDUSD had proposed, and L.B. would attend Riley for the 2020–21 academic year.

L.B. began his eighth-grade school year in fall 2020 at Riley, as planned. However, due to the COVID-19 pandemic, SDUSD schools were physically closed. All instruction and services were provided virtually. L.B. struggled in this environment both with online learning and with the "asynchronous" learning packets students were assigned to do on their own. L.B. missed classes and became agitated and aggressive toward his family members and himself during school hours. L.B. threatened his mother and younger brother with physical violence and articulated a plan to stab himself with a knife. Parents concluded that the existing IEP was not working to meet L.B.'s educational needs.

On September 29, 2020, less than one month into the school year, L.B.'s father emailed the district to alert it that L.B. would be attending Trails Carolina ("Trails"), a residential wilderness therapy program in North Carolina, starting the next day. Parents selected Trails in part because it offered in-person services at a time when schools in California were physically closed due to the COVID-19 pandemic. On October 1, 2020, SDUSD officials responded to this email by stating that the district would not fund the placement, as it believed it had offered L.B. an IEP that

satisfied the requirements of a "free appropriate public education."

On October 1, the educational specialist in charge of L.B.'s case, Jordan Means, emailed Parents asking if they would like to hold a "formal [IEP] meeting." Means emailed L.B.'s IEP Team the following day, informing them that he had had a conversation with Parents. He stated that "[w]e need to discuss further how to better support [L.B.]," including by "[d]iscuss[ing] what worked and what did not work in his experience at Riley (virtual learning)." Parents met with the IEP Team later that week, and discussed L.B.'s placement, behavioral concerns, and FAPE. Parents consented to the General Education team member's absence, as is required under the IDEA, 20 U.S.C. § 1414(d)(1)(c)(i). The district also "disenrolled" L.B. from Riley at that time and offered him an IEP to attend Riley, to be revised when he returned.

On October 22, Sue Salorio, a lead teacher at Riley, emailed Parents asking them if they consented to the IEP the school had prepared. L.B.'s mother responded, stating that while she agreed that Parents "unilaterally placed [L.B.] at the wilderness . . . program," she wanted it "noted somewhere" that "the impetus for doing so [was] . . . his inability to successfully participate in school," given that he "did not receive many of the components necessary to support his IEP," including "group therapy" and "the opportunity to obtain support in moments of behavioral decompensation."

A week later, on October 28, Salorio emailed Parents asking if they would "like [her] to schedule another IEP to discuss your concerns from [the] last IEP." Salorio indicated that L.B. was still enrolled in SDUSD and being marked as

absent from school and that he was at risk of receiving failing grades because of his absence.  L.B.'s mother wrote back, "Sue I am not sure I understand all of this [w]ith his grades. Please can we schedule an IEP meeting this week ASAP?" Parents met with the IEP Team on November 5, 2020.  At that meeting, Parents confirmed that L.B. would be disenrolled from SDUSD.  Parents again met with the IEP Team to follow up on the "progress toward IEP goals and clarification of services offered during COVID-19" on November 13.  A week after the November 13 meeting, Salorio sent Parents "a final copy of the IEP," stating she would take "the next steps of dis-enrolling him as of 9/30/20 and reverting his grades back to the same date."

L.B. attended Trails for three months, until December 2020.  Then, Parents enrolled L.B. in Whetstone Academy ("Whetstone"), a second residential treatment center, located in South Carolina.

On March 6, 2021, Parents emailed the SDUSD IEP team to request that the district "reconsider[] its determination not to fund the placement" at a residential treatment center.  The email attached an Independent Educational Evaluation ("IEE") of L.B. conducted by Dr. Jennifer Zeisz, an educational expert.  On March 19, 2021, Salorio sent Parents a release of information for Trails so that SDUSD could "use that info along with our data to complete an annual [IEP]."  On March 23, 2021, Parents notified Salorio that L.B. had been discharged from Trails on December 31, 2020, and sent Salorio the discharge summary.  On April 13, SDUSD scheduled another IEP Team meeting with Parents for April 27, 2021.  On April 27, 2021, Parents notified SDUSD that L.B. had been enrolled in Whetstone by emailing Salorio a letter from Whetstone stating that L.B. had been enrolled there since December 30,

2020 and summarizing his progress.  Dr. Zeisz presented her findings at the April IEP "annual" meeting, held pursuant to 20 U.S.C. § 1414(d)(4)(A)(i), which requires the local education agency to review each child's IEP annually.  Dr. Zeisz opined that L.B.'s severe mental health and emotional issues caused him to "struggle[] severely with transitions" between home and school.  She specifically recommended a "therapeutic boarding environment" because the child does not need to be moved back and forth and can be in therapy as needed, not as an outpatient.  At the end of the meeting, Salorio said that the Team needed more information, and needed Parents' consent to assess L.B. at Whetstone.  Parents consented to SDUSD's assessment of L.B. at Whetstone.

During summer and fall 2021, SDUSD sent officials to South Carolina to assess L.B. at Whetstone.[3]  In October 2021, the IEP Team and Parents met again. Parents continued to ask SDUSD to fund a residential placement for L.B., but the district stated that its assessment of L.B. remained ongoing.   On November 28, 2021, SDUSD completed its evaluation, in which L.B.'s classification changed from "Emotionally Disturbed" to "Specific Learning Disability."   The updated IEP offered L.B. placement at another school for students with disabilities, Marcy-Adolescent Day Treatment ("Marcy Day").  Parents consented to the new proposed IEP, and L.B. returned to SDUSD to attend Marcy Day.

---

[3]  While the ALJ found that Parents refused requests from SDUSD to evaluate L.B. in California, the district court found "no evidence" that Parents refused such requests.

### III.  PROCEDURAL BACKGROUND

On August 31, 2022, L.B. filed a due process complaint with the California Office of Administrative Hearings ("OAH"), seeking full reimbursement from SDUSD for tuition and other costs associated with his residential placement at Trails and Whetstone. *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 242 n.9 (2009) ("[C]ourts may grant reimbursement . . . only when a school district fails to provide a FAPE *and* the private-school placement is appropriate.") (emphasis in original).  An Administrative Law Judge ("ALJ") heard the matter by videoconference over nine days and denied L.B.'s claims for relief.

The ALJ did not reach the question of whether SDUSD failed to offer L.B. a FAPE while he was privately placed because the ALJ held that SDUSD had "no duty" to offer L.B. a FAPE, reasoning that Parents had not "expressly requested an IEP" during this period.  The ALJ reasoned that Parents' meetings and communications with SDUSD were for purposes other than requesting an IEP, such as disenrolling L.B. from SDUSD so that he would not receive failing grades.  The district court affirmed.  The district court reasoned that Parents had requested IEP "*meetings*" but not an IEP "*document*," and thus SDUSD had no obligation to prepare an IEP for L.B.  L.B. timely appealed.

### IV.  STANDARD OF REVIEW

Under the IDEA, "federal courts accord considerably less deference to state administrative proceedings than they do in most instances of judicial review of agency actions, in which courts generally are confined to the administrative record and are held to a highly deferential standard of review." *Anchorage Sch. Dist. v. M.P.*, 689 F.3d 1047, 1053 (9th Cir. 2012) (citation and internal omission omitted).  The

IDEA empowers federal courts to "receive the records of the administrative proceedings," "hear additional evidence at the request of a party," and "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). Still, federal courts defer to states' "specialized knowledge and experience" in education by giving "due weight" to the states' administrative bodies. *Amanda J.*, 267 F.3d at 887–888 (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 206–08 (1982)). Courts give particular deference when the hearing officer's rulings are "thorough and careful." *R.B. ex rel. F.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 937 (9th Cir. 2007) (citation and quotation marks omitted).

We review a district court's factual findings for clear error, even when they are based on the administrative record. *Amanda J.*, 267 F.3d at 887. We review questions of law de novo. *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1310 (9th Cir. 1987). We review mixed questions of law and fact de novo "unless the mixed question is primarily factual." *Amanda J.*, 267 F.3d at 887.

We address one issue on appeal: Did the district court and the ALJ err in holding that SDUSD was not required to offer a FAPE to L.B. because Parents did not properly request an IEP document? We review this issue de novo. *Gregory K.*, 811 F.2d at 1310. Parents and SDUSD do not disagree over whether any of the relevant events occurred, and defining the legal parameters for when a school has a duty to offer a FAPE is a question of law.

## V.  DISCUSSION

### A.  Statutory Framework

"A State covered by the IDEA must provide a disabled child with such special education and related services 'in conformity with the [child's] individualized educational program,' or IEP." *Endrew F. ex rel. Joseph F v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 390–91 (2017) (alterations in original) (quoting 20 U.S.C. § 1401(9)(D)). "The IEP is the centerpiece of the statute's education delivery system for disabled children." *Id.* at 391 (citation and quotation marks omitted).  Each child's IEP is "prepared by a child's 'IEP Team,' . . . which includes teachers, school officials, and the child's parents." *Id.* (citing 20 U.S.C. § 1414(d)(1)(B)).  "Among other requirements, each child's IEP must include a statement of goals, how the child's progress will be measured, and the nature of the special education and related services to be provided." *Loffman v. Cal. Dep't of Educ.*, 119 F.4th 1147, 1155 (9th Cir. 2024); *see also* 20 U.S.C. § 1414(d)(1)(A)(i).

"To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 580 U.S. at 399.  This is the covered states' freestanding obligation with respect to every child "residing in the state," including the homeless, wards of the state, "and children with disabilities attending private schools."  20 U.S.C. § 1412(a)(3)(A) (the "Child Find" provision).

The IDEA "provides several different ways in which children with disabilities may receive publicly funded services." *Loffman*, 119 F.4th at 1155.  These include "placements by a public agency, either in a public school

with an IEP under 20 U.S.C. § 1412(a)(1) or in a private school with an IEP under 20 U.S.C. § 1412(a)(10)(B)." *Id.* In addition, and salient here, parents of a child with a disability, who previously received special education and related services under the authority of a public agency, may unilaterally enroll their child in a private school and obtain reimbursement from the agency if the "agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment." 20 U.S.C. § 1412(a)(10)(C)(ii). Thus, where parents do not agree to the offered IEP because they do not believe that program is appropriate for their child's needs, as here, "Congress meant to include retroactive reimbursement to parents as an available remedy" for the agency's failure to satisfy the FAPE criteria.[4] *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369–70 (1985) ("*Burlington*").

California has implemented its own guidelines that mirror and provide more detail to the requirements in the IDEA. 20 U.S.C. § 1412(a); *see* Cal. Educ. Code §§ 56000–56865. Among other requirements, California law defines the purpose of IEP meetings, Cal. Educ. Code § 56340; specifies the circumstances that trigger IEP meetings, *id.* § 56343; defines the required members of IEP teams, *id.* § 56341(b); and provides a "continuum of program options"

---

[4] To satisfy the criteria of FAPE, the IEP offer must provide "special education and related services that--(A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under section 1414(d) of this title." 20 U.S.C. § 1401(9).

for students with disabilities, which include "nonpublic, nonsectarian schools," *id.* § 56361, 56365, *but see Loffman*, 119 F.4th at 1153 (holding that parents plausibly alleged that the "nonsectarian" requirement violates their rights under the Free Exercise Clause because it excludes religious schools).

## B.  Application

SDUSD appears to have satisfied the federal and state procedures and provided an IEP for L.B., which was placement at Riley for virtual learning.  The problem, however, was that, in Parents' view, the plan was not meeting L.B.'s educational and mental health needs during COVID-19 amid California's complete shutdown of public schools.  Parents faced a choice: "go along with the IEP to the detriment of their child if it turns out to be inappropriate or pay for what they consider to be the appropriate placement" and seek "retroactive reimbursement . . . at their own financial risk." *Burlington*, 471 U.S. at 370, 374.  Here, Parents chose the latter approach: they enrolled L.B. in a residential wilderness treatment center with in-person services.  During this time, Parents attended six "IEP Meetings" with the IEP Team,[5] in which Parents expressed to the district that L.B.'s IEP had not worked during virtual learning and asked the district to reimburse their chosen program or fund L.B.'s placement at another residential treatment center.

---

[5]  The IEP Team referred to the meetings as "IEP meetings" in their communications, and SDUSD appeared to comply with the IDEA's procedural requirements for IEP meetings, such as asking for Parents' consent to the General Education team member's absence at the October 9, 2020, IEP meeting, as is required under 20 U.S.C. § 1414(d)(1)(C)(i).

The district court erred in holding that SDUSD had no duty to offer L.B. a FAPE during this period.  Contrary to the district court's holding, SDUSD was obligated to offer L.B. a "free appropriate public educational program" during the entire time at issue.  20 U.S.C. § 1412(a)(1)(A).  As the IDEA and California state law explain in detail, the very purpose of "IEP meetings" is to develop or revise an IEP that offers a student a FAPE.  The IDEA specifies the "IEP Team" members who must attend IEP meetings, *id.* § 1414(d)(1)(B), and explains that the IEP Team must "revise[] the IEP as appropriate to address" a range of factors, including "any lack of expected progress toward the annual goals," "information about the child provided to, or by, the parents," or "the child's anticipated needs," *id.* § 1414(d)(4)(A).    Similarly, California law requires local educational agencies to "initiate and conduct meetings *for the purposes of developing, reviewing, and revising the individualized education program* of each individual with exceptional needs," and provides a list of factors similar to that of the IDEA regarding when an IEP team must meet to revise the IEP.[6]  Cal. Educ. Code § 56340 (emphasis added).  These statutes articulate the very purpose of IEP meetings: to "review" and "revise" the IEP as needed to ensure that the IEP offers a "free appropriate public education." § 1412(a)(1)(A), § 1414(d)(4).

The requirement of an IEP offer also helps to safeguard parental rights, given that "a formal, written offer creates a

---

[6] Under California law, "An [IEP] team shall meet whenever any of the following occurs": (a) "A pupil has received [a] . . . formal assessment"; (b) "The pupil demonstrates a lack of anticipated progress"; (c) "The parent or teacher requests a meeting to develop, review, or revise the individualized education program"; or (d) "At least annually, to review the pupil's progress."  Cal. Educ. Code § 56343.

clear record that will do much to eliminate troublesome factual disputes," and "greatly assist[s] parents in presenting complaints with respect to any matter relating to the educational placement of the child." *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1526 (9th Cir. 1994) (internal alterations and quotation marks omitted); *see also Burlington*, 471 U.S. at 368 (noting that school districts have a "natural advantage" over parents in the "cooperative" IEP process).

Because the purpose of an IEP meeting under federal and state law is to develop and offer an IEP that will provide a FAPE, Parents' participation in IEP meetings created a continuous obligation during the period at issue for SDUSD to offer L.B. a FAPE. The record demonstrates that SDUSD officials understood this obligation and, in fact, offered L.B. an IEP during the time at issue. At the Fall 2020 meetings, SDUSD continued to offer the same plan, enrollment at Riley, as L.B.'s February 27, 2020, annual IEP. SDUSD recognized as much at the time. The October 9, 2020, IEP document, for example, states that "[w]hen the program [Trails] is over L.B. will be re-enrolled back at Riley *since that is the offer of FAPE*." At the April 27, 2021, IEP meeting, Ms. Busch, the principal of Riley, referenced the school's assessment of L.B. and how it might change "what our offer of FAPE is for offering the IEP." Parents and SDUSD faced the same situation as in "all *Burlington* reimbursement cases": the school district offered an IEP, and the parents rejected it and "put their child in private school." *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 13 (1993). Thus, the district court should have proceeded to the reimbursement analysis and analyzed, on the merits, whether "the public placement violated [the] IDEA and . . . the

private school placement was proper under the [IDEA]." *Id.* at 15.

The district court's error, in holding that SDUSD had no duty to offer L.B. a FAPE, rested upon a misreading of *Capistrano Unified School District v. S.W*, 21 F.4th 1125 (9th Cir. 2021), which was published shortly after the relevant circumstances in this case occurred.  However, *Capistrano* involved an "unusual series of events." *Id.* at 1138.  There, the parents of B.W., a first-grade student, withdrew B.W. from the public school district and told the public school that B.W. would be attending private school for the next two years. *Id.* at 1131.  B.W.'s parents failed to respond at all to the public school's request for an IEP meeting to develop a plan and later sought reimbursement from the public school. *Id.*  The public school and B.W.'s parents stipulated that a public school must develop an IEP when "parents have enrolled the student in private school and there is a claim for reimbursement." *Id.* at 1137.  However, we held that the school was not obligated to offer B.W. an IEP under the circumstances, given that "[t]here is no freestanding requirement that IEPs be conducted when there is a claim for reimbursement," and "when a child has been enrolled in private school by her parents, the district only needs to prepare an IEP if the parents ask for one," which B.W.'s parents had not done. *Id.* at 1138.

The district court reasoned that "*Capistrano* holds that the district need not prepare an IEP *document* until requested by parents, and speaks nothing of IEP *meetings*," and thus L.B. was not entitled to an offer of FAPE because Parents did not request an IEP "document."  But the district court's distinction between an IEP "document" and IEP "meeting"

finds no basis in *Capistrano*,[7] and disregards the federal and state statutory scheme which requires states to offer educational resources to disabled children that conform to the IEP. Moreover, the regulations demonstrate that the purpose of IEP meetings is to develop and offer an IEP constituting a FAPE to children with disabilities. Here, Parents participated in the IEP process, and SDUSD together with Parents created an IEP that purported to offer a free appropriate public education plan. Therefore, we conclude without difficulty that this case does not remotely resemble the "unusual series of events" set forth in *Capistrano*. 21 F.4th at 1138. Under the IDEA and state law, SDUSD had an ongoing duty to offer a FAPE to L.B., and the only questions to be answered are whether the IEP offered to L.B. constituted a FAPE and whether the private placements were appropriate for L.B.

C.   Whether the IEP Offered L.B. Constituted a FAPE

Given that the district court found that SDUSD was not "obligated to offer or provide L.B. with a FAPE" when he was privately placed, the district court did not consider, on the merits, whether SDUSD's IEP plan offered L.B. a FAPE while L.B. was privately placed. SDUSD argues, however, that even though it "had no duty to offer a FAPE" while L.B. was privately placed, SDUSD nonetheless held out L.B.'s IEP as "always available," and the IEP was an offer of FAPE, though Parents found it inadequate. Thus, given our holding that SDUSD was obligated to, and did, offer L.B. an

---

[7] Indeed, *Capistrano*'s reference to "IEPs" in its statement that "[t]here is no freestanding requirement that *IEPs* be conducted when there is a claim for reimbursement," 21 F.4th at 1138 (emphasis added), conveys the fact that there is no relevant distinction between an IEP document and IEP meeting.

IEP during the time period and circumstances at issue, we remand to the district court for further proceedings regarding whether the IEP that SDUSD offered actually provided L.B. with a FAPE during the 2020–21 school year while L.B. was privately placed.**[8]**

## D.  Reimbursement or Other Remedies

The IDEA grants a federal court "broad discretion" to "'grant such relief as [it] determines is appropriate' . . . in light of the purpose of the [IDEA]." *Burlington*, 471 U.S. at 369 (quoting 20 U.S.C. § 1415(i)). "Even if a parent prevails on an IDEA claim, however, reimbursement is not automatic." *Anchorage*, 689 F.3d at 1058. Rather, a parent is "entitled to reimbursement *only* if a federal court concludes both [1] that the public placement violated [the] IDEA [by failing to provide a FAPE] and [2] that the private school placement was proper under the [IDEA]." *Carter*, 510 U.S. at 15; 20 U.S.C. § 1412(a)(10)(C)(ii); Cal. Educ. Code § 56174, 56175. In determining whether placement at a residential school is "proper," we focus on whether the placement is "necessary for educational purposes," or whether "the placement is a response to medical, social, or emotional problems . . . quite apart from the learning process." *Ashland Sch. Dist. v. Parents of Student R.J.*, 588 F.3d 1004, 1010 (9th Cir. 2009) (quoting *Clovis Unified Sch. Dist. v. Cal. Office of Admin. Hearings*, 903 F.2d 635, 643 (9th Cir. 1990)).

---

[8]  SDUSD argues that L.B. waived the argument that SDUSD denied him a FAPE during his private placement, but this issue permeates L.B.'s Opening Brief. Because this issue was argued before the ALJ and the district court, and raised before us, it is not waived. *See E.M. ex rel. E.M. v. Pajaro Valley Unified Sch. Dist.*, 652 F.3d 999, 1006–07 (9th Cir. 2011).

Here, because the ALJ "concluded the District prevailed as to all issues, he did not reach the issue" of whether L.B.'s residential placements at Trails and Whetstone were appropriate. The district court, however, considered this issue in the alternative, and held, in a brief, two-paragraph ruling, that "Plaintiff fails to provide evidence as to the sufficiency of the residential treatment programs in which L.B. was placed." Thus, the district court held that "even if [L.B.] prevail[s] on the merits, he fails as to the damages he seeks."

Because the district court failed to determine whether the IEP the school district offered L.B. was appropriate, if it should find upon remand that it was not, it must consider, in that light, the appropriateness of Parents' private placement of L.B. *Carter*'s two-step test for reimbursement considers the appropriateness of the private placement only after the "federal court concludes . . . that the public placement violated [the] IDEA." 510 U.S. 7, 15 (1993). Given that "in all *Burlington* reimbursement cases, the parents' rejection of the school district's proposed IEP is the very reason for the parents' decision to put their child in a private school," the school's IDEA violation (step one) contextualizes the appropriateness of the private placement (step two). *Carter*, 510 U.S. at 13; *see Burlington*, 471 U.S. at 369 (reimbursement is appropriate "if the court ultimately determines that such placement, *rather than a proposed IEP*, is proper under the [IDEA]") (emphasis added). Here, however, because the district court did not reach the question of whether SDUSD failed to offer L.B. a FAPE, we do not know what deficiencies, if any, existed in the IEP that SDUSD offered to L.B. that the private placements provided.

If the district court determines that SDUSD did not offer L.B. a FAPE and that the private placements were appropriate, "the district court then must exercise its 'broad discretion' and weigh 'equitable considerations' to determine whether, and how much, reimbursement is appropriate." *C.B. ex rel. Baquerizo v. Garden Grove Unified Sch. Dist.*, 635 F.3d 1155, 1159 (9th Cir. 2011) (quoting *Carter,* 510 U.S. at 15–16). "In making this determination, the district court may consider all relevant equitable factors, including, *inter alia*, notice to the school district before initiating the alternative placement; the existence of other, more suitable placements; the parents' efforts in securing the alternative placement; and the level of cooperation by the school district." *Anchorage*, 689 F.3d at 1059 (citing *Forest Grove*, 523 F.3d at 1088–89). Thus, on remand, if the district court finds that SDUSD violated the IDEA, it may hold further proceedings regarding L.B.'s right to reimbursement.[9]

## VI.  CONCLUSION

For the foregoing reasons, we reverse the decision of the district court and remand. On remand, the district court is instructed to consider whether SDUSD offered L.B. a FAPE from October 9, 2020 to December 2, 2021, and, if not, whether tuition reimbursement, attorneys' fees,

---

[9] While, as SDUSD emphasizes, Parents' failure to provide 10-day notice to SDUSD of their placement of L.B. in Trails may lead any reimbursement to be reduced or denied, 20 U.S.C. § 1412(a)(10)(C)(iii)(bb), the determination of whether to reduce or deny reimbursement based on this or other equitable factors and whether L.B. may qualify for the "physical harm" or "emotional harm" exceptions to the 10-day notice requirement, § 1412(a)(10)(C)(iv)(I)(cc), (II)(bb), are issues for the district court to resolve in the first instance.

compensatory education, or other remedies may be appropriate. [10]   The district court may "hear additional evidence at the request of a party," 20 U.S.C. § 1415(i)(2)(C)(ii), and also "may remand [the issues] to the state hearing officer to decide in the first instance," *Doug C. v. Hawaii Dept. of Educ.*, 720 F.3d 1038, 1048 (9th Cir. 2013).

**REVERSED and REMANDED.**

---

[10] L.B. challenges only the district court's determinations that SDUSD did not fail to offer him a FAPE during his private placement and L.B.'s private placements were not appropriate.  Thus, the other issues that L.B. raised before the district court are forfeited.